GOTTESMAN & COMPANY, INC., Respondent-Appellant, v INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Appellant-Respondent.

First Department, June 28, 1984

## APPEARANCES OF COUNSEL

*James M. Ringer* of counsel (*Robert A. Rabbino, Jr.,* with him on the brief; *Rogers & Wells,* attorneys), for appellant-respondent.

*Richard M. Michaelson* of counsel (*Daniel Shapiro* with him on the brief; *Fried, Frank, Harris, Shriver & Jacobson,* attorneys), for respondent-appellant.

### OPINION OF THE COURT

ASCH, J.

This action arose from plaintiff Gottesman's transfer of rights obtained in 1968 from the Government of Quebec, to cut timber in that Province for a pulp mill, to a subsidiary of defendant ITT for $5,000,000 in 1970-1971. Payment of the purchase price was to be paid on a delayed basis keyed to the sales of products from the mill. There have been no

payments since 1979 since the mill built by defendant ceased operations.

Plaintiff commenced this action for the remainder of the purchase price. Defendant moved for summary judgment and, in opposition, plaintiff also requested summary judgment. CPLR 3212 (subd [b]) provides, *inter alia,* "[i]f it shall appear that any party other than the moving party is entitled to summary judgment, the court may grant such judgment without the necessity of a cross-motion." Special Term should have granted Gottesman summary judgment upon the facts presented.

ITT was obligated to pay Gottesman $5,000,000 in quarterly payments measured by mill sales. ITT breached that conceded obligation when it voluntarily and indefinitely closed the mill. ITT's argument, stated simply, is that its obligation to pay was conditioned on there being sales and that since there were no sales after it closed the mill, it is excused from making payments until it chooses to reopen the mill. ITT does not dispute that it closed the mill for economic reasons, and does not directly respond to the argument that it cannot avoid its conceded obligation to pay Gottesman by intentionally refusing to perform the condition precedent to there being sales, namely, operating the mill.

ITT claims that it has complied with the parties' agreements because, ITT asserts, the agreements expressly require payment *"only* if sales are made during 'full years of operation.' "

Paragraph 4 of the February 25, 1970 letter does not say, and cannot be made to imply, that payments would *only* be made if sales occurred during "full years of operation". ITT's own payment procedures make this clear. Until September, 1979, when ITT indefinitely shut down the mill, payments were made after every three-month period — beginning with the 13th month after operations commenced in June, 1975 — even when the mill was not operated continuously throughout each three-month period. Further, according to ITT's own payment schedule, "full years of operation" meant the full calendar year from January 1 through December 31, not, as ITT now advances for this litigation, successive 12-month periods only when

the mill was operating. Thus, ITT made its payments quarterly even when the mill was temporarily not operating because of strikes or other exigencies during the 12-month calendar year.

But even if ITT's present reconstruction of its payment obligations was accurate, it would not support ITT's current position. The assertions that payments were to be based on mill operations, and that operations might not be continuous, do not give ITT the right to voluntarily stop or otherwise avoid paying Gottesman by *indefinitely* closing the mill. To the contrary, implicit in ITT's obligation to pay Gottesman's fee quarterly in an amount to be measured by mill sales is the obligation to refrain from interfering with those sales. The indefinite closing of the mill was a breach of this obligation.

Similarly, ITT's reliance on an alleged right to withdraw after the mill was built is without basis. ITT does not claim it has withdrawn. ITT may not even be able to withdraw because it may not be able to reassign the cutting rights to Gottesman. Moreover, it would make no sense for ITT to withdraw because it would then be in the absurd position of owning a half billion dollar mill without the right to use the timber the mill was built to exploit. Finally, even if ITT could and did withdraw, it would remain financially liable to Gottesman under the parties' agreements.

Although "project" is not defined in the February 25, 1970 letter, ITT now says that "project" means not only to build but to operate the mill, and, therefore, ITT allegedly has the right to withdraw after the mill was built and operating. ITT's interpretation, however, is contradicted by the very sentence upon which ITT says it relies but which it does not quote: "We reserve the right to withdraw from the project at any time and shall have no obligation to [Gottesman] *unless the mill is constructed*" (emphasis added). Additionally, this new contention does not avoid the basic problem inherent in ITT's withdrawal argument. Since ITT admittedly has not reassigned Gottesman its rights and has not withdrawn, a defense based on its alleged right to withdraw is simply misplaced.

The parties' agreements do not address ITT's obligations once the mill was operating and then voluntarily shut

down. This is clearly shown by the fact that ITT does not contest Gottesman's claims that: (1) it never discussed voluntarily shutting down the mill after it was built; (2) the mill's continued operation was not made contingent on its profitability; (3) ITT's present position conflicts with its obligation to pay Gottesman over a minimum of 12 years; and (4) ITT's decision to go forward with the project was premised on the mill's long-term operation.

In effect, the implausibility of ITT's "full years" and "withdrawal" contentions evidences what Special Term found and what ITT seeks to deny: that the February 25, 1970 letter "says nothing about the rights of the parties in the event that the mill goes into operation but later shuts down."

ITT urges that "Gottesman argues that suspension of operation, *ipso facto,* constituted bad faith." This is not Gottesman's position. Gottesman did not bring suit when the mill was closed because of strikes or other exigencies beyond ITT's control. Gottesman only commenced this litigation after ITT publicly announced that the mill was to be closed indefinitely because its continued operation was unprofitable.

ITT's stated reason for closing the mill, its unprofitability, demonstrates, as a matter of law, that ITT breached its obligation to pay Gottesman, and precludes any factual arguments as to the circumstances and reasonableness of the mill's closing. If this were not so, then a party could unilaterally abrogate its agreements by showing that their performance had become economically burdensome (*407 East 61st St. Garage v Savoy Fifth Ave. Corp.,* 23 NY2d 275, 281).

According to ITT, the mill's design defects, labor disputes, and various other problems, which had previously affected the mill's operation, were, in large part, corrected by the time ITT voluntarily and indefinitely closed the mill. At the time of the shutdown the mill was, for the first time, expected to have sufficient sales to generate the maximum $400,000 payment to Gottesman. Thus, as ITT itself admits, the mill was not closed because of problems inherent in its operation but because ITT decided, as a

business matter, that its continued operation was not in its financial interests.

Had ITT formally abrogated its obligations by withdrawing, as it claims it can, it would have to return the cutting rights to Gottesman. Instead, by claiming that it has "acknowledged" its obligations, ITT seeks to avoid paying Gottesman *and* to keep Gottesman's exclusive cutting rights. In short, ITT's alleged "good faith" manifests its bad faith.

As a matter of law, ITT's indefinite closing of the mill for economic reasons breached its obligation to pay Gottesman.

The issue of damages is essentially not in dispute. ITT does not quarrel with Gottesman's position that if the mill were in operation, the maximum annual payment of $400,000 would be due for each year after the mill closed in 1979. With respect to damages, ITT's defense is that full payment of the $4,150,645 allegedly due Gottesman is not now due and would represent an "acceleration" of Gottesman's fee. However, this is a valid computation of damages. The measure of damages is the amount that Gottesman would have received if ITT did not close the mill, and, instead, fulfilled its obligation to pay for Gottesman's exclusive rights (see *Baer v Durham Duplex Razor Co.,* 228 App Div 350, affd 254 NY 570).

Thus, the measure of Gottesman's damage for ITT's breach is $400,000 for each year after September, 1979 until $4,150,645 is aggregated. Interest is added to each $400,000 annual payment due before the date of judgment. Each $400,000 annual payment which would have occurred after the date of judgment is discounted for each postjudgment year prior to the year that payment would have become due (see *Baer v Durham Duplex Razor Co., supra; Riess v Murchison,* 503 F2d 999, cert den 420 US 993).

As no factual issues are raised in these calculations, summary judgment is also appropriate on the issue of damages.

Accordingly, the order, Supreme Court, New York County (Blyn, J.), entered October 20, 1983 which, *inter alia,* denied defendant International Telephone and Tele-

graph Corporation's motion for summary judgment dismissing the complaint, should be modified, on the law, to grant summary judgment to plaintiff Gottesman & Company, Inc., and otherwise affirmed, without costs.

CARRO, J. P., BLOOM, KASSAL AND ALEXANDER, JJ., concur.

Order, Supreme Court, New York County, entered on October 20, 1983, unanimously modified, on the law, to grant summary judgment to plaintiff Gottesman & Company, Inc., and otherwise affirmed, without costs and without disbursements.