**RIVAS PANIAGUA, INC., Plaintiff,**

v.

**WORLD AIRWAYS, INC., Defendant.**

**No. 87 CIV. 0055 (PKL).**

United States District Court,
S.D. New York.

Nov. 30, 1987.

Steven Rosen, New York City, for plaintiff.

Freehill, Hogan & Mahar, New York City, for defendant; Nathan J. Bayer, Kevin J. Keelan, of counsel.

## OPINION AND ORDER

LEISURE, District Judge:

This is an action for breach of contract and damages. Plaintiff claims that defendant breached a Letter of Agreement signed by the parties in August 1985, pursuant to the terms of which plaintiff agreed to publish defendant's official airline flight magazine.

This Court, pursuant to Fed.R.Civ.P. 42(b), bifurcated trial. A non-jury trial on liability for breach of the August 1985 Letter of Agreement was held on November 16, 1987. The findings of fact and conclusions of law herein, made pursuant to Fed. R.Civ.P. 52(a), address only the issue of liability.[1]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Rivas Paniagua, Inc. ("Paniagua, Inc."), is a New York Corporation, whose president and sole stockholder is Ralph Paniagua, a publishing consultant. Since 1980, Paniagua, Inc.'s business activities have included the publishing and preparation of magazines and advertising brochures for distribution on airline flights.

Defendant, World Airways Inc. ("World Airways"), is a California Corporation, with its principal place of business in Oakland, California. During the period from January 1985 to September 15, 1986, World Airways operated regularly scheduled and chartered commercial passenger airline flights to various destinations in the United States and abroad. Since September 15, 1986, however, World Airways has provided flight service only for United States military personnel, and has ceased all commercial passenger flights.

In early 1985, World Airways marketing and advertising executives decided to seek a new publisher for the airline's passenger flight magazine. In February or March of 1985, Aimee Johnson, a World Airways Vice President, indicated this interest to Robert Grossman, a business affiliate of World Airways. Mr. Grossman suggested that Ms. Johnson consider Paniagua, Inc., as the new publisher. Mr. Grossman then suggested to Mr. Paniagua that he communicate directly with Ms. Johnson. Soon after, Mr. Paniagua did contact Ms. Johnson, who suggested that Mr. Paniagua contact Michael Henderson, World Airways' director of Advertising and Public Relations at the time. During initial conversations, both Mr. Paniagua and Mr. Henderson expressed an interest in a publishing contract between the parties.

Mr. Henderson delegated to Kathryn Carlson, a member of his department, the responsibility for arranging the change of publishers for the airline flight magazine. From April 1985 through the summer of that year, Mr. Paniagua worked with Ms. Carlson and Mr. Henderson to establish the terms of an agreement between the parties. Ms. Carlson testified at trial that Paniagua, Inc., was the only publisher willing to prepare the magazine without requiring World Airways to pay a fee—all of Paniagua, Inc.'s earnings would come from the sale of magazine advertisements. Such an arrangement was highly attractive to World Airways.

---

1. On November 16, the trial date, the parties had not yet completed full discovery on the issue of damages. The Court determined that further discovery and trial on the issue of damages would be appropriate only if defendant is liable for breach of contract.

At some point during the summer of 1985, Mr. Henderson asked Mr. Paniagua to prepare a draft contract. Such a draft contract, modeled on other airline flight publication contracts to which Paniagua, Inc., had been a party, was submitted to World Airways by Mr. Paniagua in early August 1985. Paragraph K of the proposed contract stated that the agreement would be in effect for a period of two years, and that termination of the agreement would require 60 days notice in writing from either party.

When Mr. Henderson received the draft proposal from Mr. Paniagua, Ms. Carlson was asked to participate in the review of the proposed terms. Mr. Henderson was not satisfied with the 60-day termination notice period suggested by Mr. Paniagua; instead, Mr. Henderson wanted a longer notice period. Mr. Henderson drafted new language which appeared as paragraph K of the Letter of Agreement ultimately signed by the parties (Plaintiff's Exhibit 1) (the "Contract"). Paragraph K of the Contract, as redrafted by Mr. Henderson, reads, "this agreement will be in effect for a period of two years starting September 1, 1985 and can be terminated at any time with written notice of 120 days by either party."

Mr. Paniagua was willing to accept the longer notice period proposed by Mr. Henderson. Mr. Paniagua knew that he would need to secure advertisers for forthcoming issues of the flight magazine several months in advance of publication, and thus he needed protection from abrupt termination of the Contract; the 120-day notice period provided him with even more sufficient protection than the 60 day notice period he had himself proposed.

Mr. Henderson signed the Contract on August 22, 1985, and Mr. Paniagua signed the Contract on August 29, 1985.[2] Prior to that date, however, Mr. Paniagua had already begun the work necessary to allow a draft of each forthcoming issue of the magazine to be prepared four to five months in advance of the targeted distribution date; with such lead time, World Airways marketing officials and in-house legal counsel could review the magazine format and layout, and edit the text of magazine articles.

The first issue of the new flight magazine was published and distributed on World Airways flights in September 1985. One magazine was published for every seven to eight expected passengers; thus, in September 1985 through November 1985, approximately 12,000 copies of each monthly issue were printed by Paniagua, Inc. In December 1985, approximately 15,000 copies were printed. From January 1986 through May 1986, approximately 17,000 copies were printed each month. And in June, July, and August of 1986, between approximately 18,000 and 20,000 copies per month were published.

At some time prior to August 1986, World Airways decided that, beginning in mid-September of 1986, it would terminate all commercial passenger flight service, and from that point forward only provide flight service for military personnel. At some time during the summer of 1986, Franco Mancassola, World Airways' Vice President for Marketing and Ms. Carlson's supervisor, told Ms. Carlson—who in July 1986 had replaced Mr. Henderson as World Airways' director of advertising and public relations—that the flight magazine published by Paniagua, Inc., would not be needed after September 1986. Mr. Mancassola asked Ms. Carlson to prepare a letter informing Mr. Paniagua that the Contract would be terminated, but Mr. Mancassola instructed Ms. Carlson to give Mr. Paniagua no explanation of the cause of the cancellation; at the time, World Airways' decision to end commercial passenger service had not yet been announced, and Mr. Mancassola did not want that information to be made public.

2. The signature line for Mr. Paniagua on the Contract is actually dated "9/29/85"; the parties stipulated at trial, however, that Mr. Paniagua had committed an error at the time he signed the contract; and that the correct signature date was 8/29/85. Before signing the final Contract, Mr. Paniagua reviewed its terms with John O'Connor, an acquaintance admitted to practice law in Puerto Rico.

Ms. Carlson then prepared a draft letter to Mr. Paniagua. At some point during the first ten days of August 1986, Ms. Carlson sent a handwritten note (Plaintiff's Exhibit 4) to Daulton J. Lewis, Jr., World Airways' vice president for legal affairs. That handwritten note stated:

Daulton,

Franco has asked me to cancel contract for inflight magazine.

Attached is a copy of the contract, which calls for a 120–day cancellation in item K.

We don't pay anything for the magazine except minor monthly type-setting charges.

My question ... should we cancel now or give 120 days notice. I'm unsure if he has grounds for any legal action if I cancel effective with October issue.

Please let me know soonest.

Thanks.

P.S.: Is my letter OK?

Ms. Carlson testified that both Mr. Mancassola and Mr. Lewis approved the text of her draft letter. The final version of the letter (Plaintiff's Exhibit 3), dated August 11, 1986, states:

Dear Ralph:

I'd like to preface this letter by saying that Rivas Paniagua, Inc. has done a terrific job for World Airways in producing our magazine, *World.*

However, it is with a great deal of regret that I must inform you that World will no longer need your services effective with the October 1986 issue. In other words, September will be the last issue World will need.

I am not at liberty to discuss the why of the decision, let's just say that we won't be needing the magazines. I realize that the contract has a 120 day cancellation provision but, RPI would only be wasting time, energy and money if the magazines were to be produced beyond the September issue. Had I been able to give 120 days notice, I would have.

Please know that World is grateful to you and your staff for such a job well done and I, personally, wish you and RPI the best of success.

Mr. Paniagua was on a business trip when his office received Ms. Carlson's letter of August 11. Mr. Paniagua telephoned his office during the morning of either August 18 or 19, when he was about to board a flight to return to New York, and Ms. Carlson's letter was read to him over the telephone. Mr. Paniagua was shocked. When he returned to his New York office, he immediately called Ms. Carlson to express his dismay at the cancellation letter. He told Ms. Carlson that a cancellation itself was not necessarily a problem, but that he needed to have 120 days notice. Ms. Carlson, acting under the instructions she had received from Mr. Mancassola, only responded vaguely, indicating that she could not give a reason for the cancellation.

Over the next several days, Mr. Paniagua called Ms. Carlson several times each day, but never received an explanation of the cancellation. During one of these conversations, Mr. Paniagua told Ms. Carlson that he had heard from friends in the airline industry that beginning September 15, World Airways would no longer provide commercial passenger flights. Ms. Carlson told him that she could only say that after September 15, there would be no more need for the flight magazine. During another of these conversations, Ms. Carlson suggested that Mr. Paniagua call Mr. Lewis.

Mr. Paniagua left phone messages for Mr. Lewis four or five times, but Mr. Lewis did not return the calls. On the evening of August 25 or August 26, however, Mr. Paniagua reached Mr. Lewis late in the day at his office in California. Mr. Paniagua asked Mr. Lewis to confirm that World Airways was planning to cancel its commercial passenger flights and asked about the 120–day notice provision in the contract, but Mr. Lewis, like Ms. Carlson, only gave vague responses to these inquiries.

A second phone conversation between Mr. Paniagua and Mr. Lewis was held the following day. During this conversation, Mr. Lewis indicated that Paniagua, Inc., could continue to publish the flight magazine, but stated that no use for the maga-

zine would exist once the passenger flights would be cancelled. In his deposition, Mr. Lewis testified that he tried to leave the impression with Mr. Paniagua that, even if the magazines were shipped by Panigua, Inc., to World Airways, World Airways would not distribute the magazines. (Lewis Deposition, p. 29).

Finally, on September 2, 1986, Mr. Lewis sent a letter (Plaintiff's Exhibit 3) to Mr. Paniagua. That letter stated:

Dear Mr. Paniagua:

Pursuant to the terms of the Letter Agreement dated August 22, 1985 and September 29, 1985 between World Airways, Inc. and Rivas Paniagua, please consider this letter as our notice to you that we are hereby terminating our Letter of Agreement effective 120 days from the date of this letter.

We appreciate the effort your company has expended in producing the "Voyager" Magazine for World Airways.

Despite this letter of September 2, it is clear that World Airways failed to provide Paniagua, Inc., with the 120 days notice required by Paragraph K of the Contract. Ms. Carlson's letter of August 11, 1987 unambiguously communicated that "September will be the last issue World will need." The in-house communications between Ms. Carlson and her superiors confirm that World Airways was aware that it was not giving Paniagua, Inc., 120 days notice. The unambiguous message of the August 11 letter was confirmed in Mr. Paniagua's conversations with both Ms. Carlson and Mr. Lewis after August 18. And Mr. Lewis himself testified in his deposition that if Paniagua, Inc., were to choose to deliver any magazines to World Airways, World simply would not distribute them. In effect, by September 2, there could be no doubt whatsoever that the September issue of the flight magazine would be the last issue that could be produced under the terms of the Contract. Mr. Lewis' letter of September 2 could not alter this clear message given Paniagua, Inc. At best, Mr.

Lewis' September 2 letter only serves as evidence that earlier communications with Paniagua, Inc., had failed to give the 120 day notice required by the contract.

World Airways presented no evidence at trial to dispute that the contract required 120 days notice of termination. Nor did World Airways present any evidence to show that 120 days notice was indeed given to Paniagua, Inc. Instead, World Airways has raised two affirmative defenses: World argues that performance of the Contract was excused either by the doctrine of impossibility or the doctrine of frustration of purpose. The parties agree that New York law applies to interpretation and construction of the contract in this case. Under New York law, however, neither of the affirmative defenses raised by World Airways has merit.

The doctrine of impossibility itself "may be equated with an inability to perform as promised due to intervening events, such as an act of state or destruction of the subject matter of the contract." *United States v. General Douglas MacArther Senior Village, Inc.*, 508 F.2d 377, 381 (2d Cir.1974). As the Second Circuit has explained, the doctrine of impossibility "comes into play where (1) the contract does not expressly allocate the risk of the event's occurrence to either party, and (2) to discharge the contractual duties (and, hence, obligation to pay damages for breach) of the party rendered incapable of performing would comport with the customary risk allocation." *Id.*

New York courts, however, have generally limited "the excuse of impossibility of performance ... to the destruction of the means of performance by an act of God, *vis major*, or by law." *407 E. 61st Garage v. Savoy Fifth Avenue Corp.*, 23 N.Y.2d 275, 281–82, 296 N.Y.S.2d 338, 343–44, 244 N.E. 2d 37, 41 (1968) (citations omitted).[3] *See also VJK Productions v. Friedman/Meyer Productions*, 565 F.Supp. 916, 920 (S.D.N. Y.1983) (Sprizzo, J.) (the defense of impos-

---

**3.** "*Vis major* is a loss which proximately results from natural causes and which could have been prevented by the exercise of prudence, diligence and care. *Vis major* is clearly inapplicable here

since defendant's failure to perform was not a result of natural causes." *VJK Productions v. Friedman/Meyer Productions*, 565 F.Supp. 916, 920 n. 5 (S.D.N.Y.1983).

sibility of performance "is available only when the inability to perform results from an act of God, *vis major* or operation of law"); *Goodyear Publishing Co., Inc. v. Mundell*, 75 A.D.2d 556, 557, 427 N.Y.S.2d 242, 243 (1st Dept.1980) (mem.).

█ Whatever broad categories of circumstances might justify· reliance on the excuse of impossibility under New York's generally restrictive standard, it is clear that a circumstance created by a party's own economically motivated action cannot be a basis for reliance on the impossibility defense. As the New York Court of Appeals has explained, "where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *401 E. 61st Garage*, 23 N.Y. 2d at 275, 296 N.Y.S.2d at 281, 244 N.E.2d at 41. *See also Gottesman & Co. v. International Telephone & Telegraph Corp.*, 102 A.D.2d 407, 410, 477 N.Y.S.2d 139, 141 (1st Dept.1984); *Piro v. Bowen*, 76 A.D.2d 392, 399, 430 N.Y.S.2d 847, 852 (2d Dept. 1980). *Cf. Canfield v. Reynolds*, 631 F.2d 169, 177 (2d Cir.1980) ("we conclude that the district court correctly determined that Reynolds' covenant was not qualified in any way, and that Reynolds had assumed the risk that a public offering would not come about. The mere fact that this undertaking may have become burdensome, as a result of subsequent, perhaps unanticipated developments, does not operate to relieve Reynolds of his obligation.").

█ In the present case, World Airways claims that its decision to cancel all commercial flights made it "impossible" to provide Paniagua, Inc., with the 120 days notice of termination required by the Contract. However, that decision to cancel all commercial flights cannot be considered an act of God, *vis major,* or required by law. Rather, World Airways unilaterally chose to cancel commercial flights, presumably for its own economic benefit. Just as the financial difficulty which might have encouraged World to cancel its commercial flights does not excuse performance of the Contract, nor does the unilateral act that provided World with an economic benefit excuse World from its obligations under the Contract.

If World Airways had chosen to continue its commercial flight service for a minimum of 120 days, then it could indeed have provided Paniagua, Inc., with the notice required by the Contract. Thus, performance by World Airways was at all times *possible,* although such performance admittedly may have been unprofitable. Under such circumstances, the legal excuse of impossibility of performance is not available. *See 401 E. 61st Garage*, 23 N.Y.2d at 282, 296 N.Y.S.2d at 344, 244 N.E.2d at 41 (where defendant hotel owner claimed to be excused from performance because of its decision to close an unprofitable hotel, "performance by [defendant] was at all times possible, although unprofitable, since the hotel could simply have remained in business, and the legal excuse of impossibility of performance would not be available to it"). Under this analysis, World Airways should only have considered the decision to cancel commercial flights a genuine "economic benefit" if the economic gains from that decision were to be greater than the cost of damages caused by the contract breach the decision necessitated.

In any event, World Airways never demonstrated that cancellation of its flights actually made performance of the 120–day notice provision *impossible.* No evidence was presented at trial to show that World Airways did not know at least 120 days in advance of September 15 that commercial flights might be cancelled. Notice could have been given at that time.[4]

---

4. Moreover, even if World Airways had been previously uncertain whether its commercial flights would be cancelled, it could have protected itself by providing in the Contract, or in some subsequent agreement, for a termination procedure to be followed if commercial flights were ever to be cancelled. Defendant argues that the Contract was ambiguous and, because drafted by plaintiff, any ambiguities should be resolved against plaintiff to show that plaintiff indeed did agree to excuse performance if World Airways commercial flights were ever to be cancelled. Defendant refers to the preamble of the Contract, which states, "This agreement is

Nor can defendant rely on frustration of purpose to excuse its failure to provide plaintiff with 120 days notice of termination. As the Second Circuit has explained:

> [f]rustration of purpose ... focuses on events which materially affect the consideration received by one party for his performance. Both parties can perform but, as a result of unforeseeable events, performance by party X would no longer give party Y what induced him to make the bargain in the first place. Thus frustrated, Y may rescind the contract. Discharge under this doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.

*General Douglas MacArthur Senior Village*, 508 F.2d at 381.

In circumstances similar to the present case, the New York Court of Appeals ruled that frustration of purpose was inapplicable as a defense to breach of contract. In *407 East 61st St., supra*, under the terms of a written agreement, a garage had undertaken to furnish garage services for a period of five years to guests of a hotel (the Savoy Hilton) and to pay Savoy 10% of its gross transient storage charges to the hotel guests. Savoy agreed to use all reasonable efforts to provide the garage with the exclusive opportunity for storage of the motor vehicles of the hotel guests. In ruling that the decision of the hotel to close for financial reasons did not excuse the hotel from its obligations under the written agreement, the Court of Appeals explained:

> Cases involving frustration of the purpose of the contract are inapposite. Here, the purpose of providing garage services to hotel guests was frustrated only when Savoy itself made a business decision to close the hotel, and did not result from unanticipated circumstances. Moreover, rather than relying on a circumstance that was unanticipated, Savoy itself argues that is financial stringency was always known.

> In short, the applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts. If, in fact, the agreement expresses or implies a promise that the hotel would remain liable for the contract term, that promise should be honored, regardless of financial hardship.

> Concededly, it would not have made sense for Savoy to stay in the hotel business solely to avoid liability for breach of its contract with the garage. Such lack of business reason does not nullify the liability for damages, whatever effect it may have on a right to specific performance. However, if the patronage of the hotel had declined, proof of that situation, although perhaps not justifying termination of the garage's contract right, may have a significant bearing on the

predicated upon the present scheduled routes designated by the Airline at the signing of this agreement, plus any additional routes added, either scheduled or charter [sic] by the Airline." However, this language in no way indicates that the parties expected the contract to be terminated without 120 days notice, in the event World Airways cancelled any or all of its commercial passenger flights. Moreover, paragraph K of the Contract, the notice provision, is clear and unambiguous. In any event, while the initial draft of the Contract may have been prepared by plaintiff, defendant's house counsel, Mr. Lewis, not only reviewed the draft, but also made changes which were included in the final draft—including an extension of the termination notice period from 60 days to 120 days. Under New York law, resolution of any ambiguities against the drafter is appropriate only where it is clear that one party drafted the contract, as in the case where one of the parties provides a printed form contract. *See, e.g., Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 348, 126 N.E.2d 271, 273–74 (1955) (resolving ambiguities against a drafter "is particularly appropriate ... where the contract was embodied in a printed form prepared specifically by plaintiff for its use and where plaintiff itself, by its own delay of delivery, introduced the element of uncertainty into an otherwise clear provision"); *see also Goldfield Corp. v. General Host Corp.,* 29 N.Y.2d 264, 272, 327 N.Y.S.2d 330, 337, 277 N.E.2d 387, 392–93 (1971); *D'Ambrogio v. Morgenstern,* 135 Misc.2d 643, 516 N.Y.S.2d 447, 449–50 (1987). In the present case, both parties played a role in the drafting of the final Contract.

measure of damages sustained by the garage through loss of future profits. *407 E. 61st Garage*, 23 N.Y.2d at 282–83, 296 N.Y.S.2d at 344–45, 244 N.E.2d at 42 (citations omitted).

■ Similarly, in the present case, the purpose of providing and distributing flight magazines was only "frustrated" when World Airways made a business decision to terminate its commercial flight services; certainly, no frustration occurred as a result of unanticipated, "virtually cataclysmic" circumstances. Moreover, rather than relying on a circumstance that was unanticipated, World Airways itself argued at trial that Paniagua, Inc., was always aware that World might have needed to alter its flight schedules for various reasons. It may very well not have made sense for World Airways to stay in the commercial flight business, solely to avoid liability for breach of its contract with Paniagua, Inc. But this, under New York law, does not nullify World Airways' liability for breach of its contract, whether or not the circumstances that caused World Airways to terminate commercial flights were known by the parties at the time the Contract was signed.

Finally, defendant argues in its trial brief that plaintiff itself breached the contract by failing to deliver the September through December issues of the flight magazine. As to the October, November, and December issues, plaintiff clearly had been told by defendant that the contract would be terminated after the September issue and that, if delivered, any later issues would not be distributed. Clearly, defendant specifically requested that those issues not be published; defendant breached the contract by failing to make that request with 120 days notice.

■ As to the September issue, plaintiff's failure to deliver applies to the issue of damages, rather than to the issue of defendant's breach. Defendant may be able to argue that plaintiff failed to mitigate damages, or that plaintiff is not entitled to damages for the period when the September issue was to be distributed on World Airways flights. But any failure to

deliver the September issue does not excuse defendant's failure to provide 120 days notice when it terminated the contract by the letter dated August 11, 1986. Moreover, even if plaintiff's failure to deliver the September issue did constitute a breach of plaintiff's obligations under the contract, defendant has not made any claim for damages as a result of that breach.

### CONCLUSION

Defendant is thus liable for breach of the August 1985 Letter of Agreement (the "Contract"). The parties are hereby directed to complete discovery on the issue of damages by January 13, 1988, and to submit an addendum to the Joint Pre–Trial Order, detailing the evidence on damages to be used at trial, by January 15, 1988. A trial on the issue of damages will be held on January 20, 1988, before this Court, in Courtroom 36, United States Courthouse, New York, New York.

SO ORDERED: