**MG REFINING & MARKETING, INC., Plaintiff,**

v.

**KNIGHT ENTERPRISES, INC. et al., Defendants.**

**No. 94 CIV. 2512(SS).**

United States District Court, S.D. New York.

Oct. 26, 1998.

Kaye, Scholer, Fierman, Hays & Handler, L.L.P., New York City, Randolph S. Sherman, Robert B. Bernstein, Jenny Pearlman, Roderick W. Chin, for Plaintiff.

Bode & Beckman, L.L.P., Washington, D.C., William H. Bode, James M. Ludwig, Daniel E. Cohen, Lane & Mittendorf, New York City, for Defendants.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

These cross-motions for summary judgment arise from a dispute between MG Mar-

keting & Refining, Inc. ("MG") and eighteen of its customers, including Knight Enterprises, Inc. (collectively the "Customers"), in which the Customers allege breaches of certain 45–day contracts. In its pleadings, MG has admitted non-performance but asserts the affirmative defenses of illegality and impossibility. MG now moves for summary judgment on the ground that the contracts at issue were illegal and therefore void. The Customers move for summary judgment dismissing MG's illegality and impossibility defenses.

For the reasons discussed below, this Court denies both parties' motions with respect to the defense of illegality, and grants the Customers' motion with respect to the defense of impossibility.

### BACKGROUND

The following facts are not disputed in any material way. The Customers are commercial entities that either use or engage in business activity relating to the wholesale, retail, supply, storage or distribution of diesel fuel and other petroleum products. (*See* Def.'s Rule 56.1 Statement ¶¶ 1–18.) MG was at one time the primary operating subsidiary of MG Corporation, and was at all relevant times herein a trader, distributor and marketer of oil and other oil related products. (*See* Def.'s Rule 56.1 Statement ¶ 19.)

Beginning as early as December 1991 and continuing through December 1993, MG marketed and sold to the Customers certain long-term contracts for the delivery of unleaded gasoline or heating oil at a fixed price and over a term of five or ten years. Without the use of a regulated exchange market, the parties entered into agreements with an aggregate stated volume of 160 million barrels by the end of 1993. The contracts themselves came in two forms. Under the first kind (the "ratables"), the Customers were required to take monthly deliveries on a ratable basis, and MG was required to meet the stated requirements. Except in a few cases where ratables were repudiated early in 1994, physical delivery occurred regularly under these contracts, (*see* Def.'s Rule 56.1 Statement ¶ 27), and all of the Customers had the physical capacity to take these deliveries.

The second kind of contract (the "flexie" or "45–day contract") was nearly identical to the first, but the delivery requirements were modified to read as follows:

Delivery under this Agreement shall be made no earlier than the Term Commencement Date and no later than the Term End Date. Purchaser shall notify Seller in writing of each Lifting date, which shall be no earlier than forty-five (45) days after such written notification has been received by Seller. Such written notice shall also include the quantity of the Product to be transferred from Seller to Purchaser on such Lifting Date. If as of the day that is forty-five (45) days prior to the Term End Date (the "Last Notice Date"), Purchaser has not provided Seller with written notice of the Lifting Date with respect to any quantity of Product remaining to be delivered as of such Last Notice Date, the Lifting Date for such quantity of undelivered Product shall be the Term End Date

(*E.g.*, Pl.'s Mem. Ex. 2 at ¶ 2.) Although MG sold flexies to the Customers with an aggregate stated volume of approximately 60 million barrels, none of the Customers has ever requested physical deliveries under a flexie, and few, if any, had the capacity to take the full stated volumes all at once. (*See* Def.'s Rule 56.1 Statement ¶ 8.)

Both the ratables and the flexies also contained a provision (the "blow out" provision), which allowed the Customers to cash out their contracts and terminate any remaining delivery requirements in the event of a "price spike"—i.e., if the price of petroleum futures on the New York Mercantile Exchange ("NYMEX") rose higher than a level stated in the contracts. This provision reads as follows:

At any time during the Term of this Agreement that the Fixed Cash Price is less than the bid price for the applicable NYMEX Futures Contract . . ., Purchaser may, in lieu of accepting all or part (in lots of 42,000 gallons) of the remaining deliveries of Product, accept cash payments from Seller based on the average of bid prices

obtained by Seller in totally or partially liquidating its long hedge positions for this Agreement (the "Average Bid Price") in the applicable NYMEX Futures Contract.... Upon Purchaser's receipt of cash payments from Seller representing all of the remaining deliveries of Product, Seller shall have no obligation to deliver any further Product under this Agreement and this Agreement shall terminate.

(*E.g.*, Pl.'s Mem. Ex. 2 at ¶ 16(a) (flexie language); Def.'s Mem. Ex. 45 ¶ 16(a) (ratable language).) The contracts specified that "[t]he cash payment to be received by Purchaser shall be an amount equal to [either 100% or 50%, depending on whether this is a flexie or a ratable, respectively, of] the product of the number of gallons represented by the long hedge positions to be liquidated multiplied by the difference between the Average Bid Price for the applicable NYMEX Futures Contract and the Fixed Cash Price." (*E.g.*, Pl.'s Mem. Ex. 2 at ¶ 16(a) (flexie language); Def.'s Mem. Ex. 45 ¶ 16(a) (ratable language).)

Relations between the parties continued normally and without interruption until 1994, when the CFTC's Division of Enforcement began investigating the flexies and announced in November that they might be illegal off-exchange futures contracts. The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, requires that futures contracts be marketed and entered into only through certain designated "contract markets," which meet very specific CEA requirements. To call the flexies "illegal off-exchange futures contracts" is thus to suggest that they are illegal because they are futures contracts, subject to CEA regulation, but were entered into without the aid of a contract market.

These investigations continued for some time, until MG submitted an offer of settlement that the CFTC accepted, and which was formally entered into on July 27, 1995. The resulting order stopped the initiation of any full-scale enforcement proceedings against MG, assessed MG a $2.25 million penalty, established a series of oversight requirements for the corporation, declared the contracts to be "illegal off-exchange futures contracts", and required MG to certify within five days that it had notified "all Purchasers of existing 45 Day Agreements that the Commission has entered this Order finding that the 45 Day Agreements are illegal and therefore void ... and directing [MG] to cease and desist from violating" the relevant sections of the CEA. (*See* Pl.'s Mem. Ex. 1, at 8–11 (hereinafter "CFTC Order").) On July 27, 1995, MG's President issued letters to the Customers explaining the CFTC's Order and claiming that MG was "barred ... from performance" under the flexies. (*See, e.g.*, Def.'s Mem. Ex. 94.) In 1996, when the NYMEX reference price exceeded the fixed contract price, every Customer wrote in to MG and asked to exercise their contractual rights to cash out all of their flexies. (*See* Pl.'s Rule 56.1 Statement ¶ 10.) MG refused to perform.

Although disputes between the present parties began as early as April 8, 1994, when MG filed its original complaint against Knight Enterprises on a related matter, the Court consolidated all of the Customers' actions for pre-trial purposes on March 11, 1996. By then, the Customers had alleged breach of the 45–day contracts, and MG subsequently responded to these claims by moving to dismiss. In its motion, MG argued that the Customers were collaterally estopped from denying an affirmative defense of illegality because the CFTC had already declared the flexies illegal and therefore void, that the present action amounted to an illicit collateral attack on the CFTC Order, and that MG could not be held liable for damages because the Order made performance under the flexies impossible. The Customers countered that MG was judicially estopped from asserting the illegality of the flexies because MG had advanced an inconsistent position in a prior arbitration proceeding. The Customers also argued that MG waived its right to deny the legality of the flexies under the express terms of the contracts.

On January 22, 1997, this Court denied MG's motion to dismiss. *See In re MG Refining & Marketing, Inc. Litigation*, No. 94 Civ. 2512(SS), 1997 WL 23177 (S.D.N.Y. 1997). The Court held that although the CFTC Order declared the flexies "illegal and therefore void," the Customers were not col-

laterally estopped from challenging this determination because they were not parties to the CFTC action and the issue of legality had never been fully adjudicated. The Court also held that the absence of any full adjudication before the Commission implied that the present action could not be considered a collateral attack at all on the CFTC's proceedings, and so certainly could not be considered an illicit one. With regard to impossibility, the Court noted that the only Second Circuit case cited in which a consent order was deemed sufficient to ground a defense of impossibility—i.e., *Harriscom Svenska AB v. Harris Corp.*, 3 F.3d 576 (2d Cir.1993)— seemed to require a finding that the consenting party had not acted in bad faith. The Customers' evidence "that MG solicited [the] Consent Order ..., with its language declaring the 45 day agreements illegal, specifically for purposes of evading its responsibility under the 45 day agreements" therefore "raise[d] a factual question as to MG's good faith in procuring the CFTC's Order, [which prevented] dismissal of the customers' claims on the ground of impossibility at [that] stage of the proceedings." *MG Refining*, 1997 WL 23177, at *7.

The Court also rejected the Customers' two arguments concerning judicial estoppel and waiver. Noting the absence of any indication that MG had directly asserted the flexies' legality in the prior cited arbitration proceedings, or that the arbitrator had in any way adopted this view, the Court held that MG was not judicially estopped from asserting illegality in the present action. The Court rejected the Customers' argument on waiver as well, because even explicit agreements to waive a defense of illegality are ineffective under the law.

After this opinion was issued, discovery proceeded without interruption until a dispute arose a claim of attorney-client privilege late in 1997. At issue was whether MG had necessarily waived this privilege by invoking the doctrine of impossibility on the basis of a consent order. On December 17, 1997, the Court held a teleconference to discuss this matter with the parties. Realizing that the entire case might be disposed of on the basis of either an illegality or impossibility de-fense, the Court invited cross-motions addressed solely to these doctrines and stayed the pending discovery dispute until after these motions were decided. The present Opinion disposes of the arguments raised in the cross-motions.

## DISCUSSION

Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In examining the record, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Gibson v. American Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir.1989); *see also Celotex*, 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2. The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Procedurally, Rule 56(c) thus places an initial burden on the moving party to make out a case that there are no material facts in dispute and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Once this initial burden has been met, a limited burden of production shifts to the non-moving party, and this party can survive summary judgment only by showing that there is, in fact, still a "genuine" issue of material fact to be decided. *See* Fed.R.Civ.P. 56(c), (e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. This party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

■ Where there are cross-motions for summary judgment, "the standard is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other .... Simply because the parties have cross-moved, and therefore have implicitly agreed that no material issues of fact exist, does not mean that the court must join in that agreement and grant judgment as a matter of law for one side or the other." *Aviall, Inc. v. Ryder System, Inc.*, 913 F.Supp. 826, 828 (S.D.N.Y.1996), *aff'd*, 110 F.3d 892 (2d Cir. 1997). "Only where one of the parties is entitled to judgment as a matter of law upon material facts not genuinely in dispute is the Court warranted in granting summary judgment." *Corsini v. Ross*, No. 97 Civ. 0968(JGK), 1997 WL 539950, at *3 (S.D.N.Y. Aug.28, 1997).

■ Some of the issues in this motion for summary judgment will require this Court to engage in questions of contract interpretation. Generally, "summary judgment based upon construction of a contract is appropriate only if the *meaning of the language is clear*, considering all the surrounding circumstances and undisputed evidence of intent, and there is no genuine issue as to the inferences that might reasonably be drawn from the language." *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir.1995) (emphasis added); *see also Healy v. Rich Products Corp.*, 981 F.2d 68, 72 (2d Cir. 1992). Whether a contractual provision is ambiguous is a question of law, however, *see, e.g., Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir.1990), and a provision will be considered ambiguous whenever it admits of more than one interpretation "when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in a particular trade or business." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996). Courts cannot interpret ambiguous contractual language without looking to extrinsic evidence concerning the parties' intent. This evidence will leave a genuine issue of material fact, which precludes summary judgment,

whenever the evidence can support more than one reasonable interpretation of the relevant provisions, and whenever such differences are material to the outcome of the case. *See Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993); *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992); *Burger King Corp.*, 893 F.2d at 528; *see also Chock Full O'Nuts Corp. v. Tetley, Inc.*, 152 F.3d 202, 204 (2d Cir.1998) ("Notwithstanding the existence of contractual ambiguities, summary judgment may be granted if under any of the reasonable interpretations the moving party would prevail.")

### 1. The Affirmative Defense of Illegality

■ The issue of illegality arises in this case because § 4 of the CEA makes it "unlawful for any person to offer to enter into, to enter into, to execute, [or] to confirm the execution of ... a contract for the purchase or sale of a commodity for future delivery ... unless ... such transaction is conducted on or subject to the rules of a board of trade which has been designated by the Commodity Futures Trading Commission as a 'contract market' for such commodity ...." 7 U.S.C. § 6(a)-(a)(1). MG's illegality defense rests on the fact that the flexies, which appear to be "contracts for the purchase or sale of a commodity for future delivery," were never entered into in accordance with the rules that this section specifies. Absent some exception to § 4a, the flexies would therefore qualify as illegal off-exchange futures contracts.

### a. The Customers' Motion for Summary Judgment on MG's Illegality Defense

The Customers argue that MG's illegality defense must fail as a matter of law because the flexies fit into one or more of the following three exceptions to § 4a: the "trade option" exception, *see* 17 C.F.R. § 32.4(a) (exempting commodity options when the offeror has a "reasonable basis to believe" that it is offering the option to "a producer, or commercial user of, or merchant handling, the commodity which is the subject of the com-

modity option transaction ... and that such producer, processor, or commercial user or handler is offered or enters into the commodity option transaction solely for purposes related to its business as such"), the "swaps" exception, *see* 17 C.F.R. § 35.2 (exempting certain swap agreements, as specified therein), or the "forward contract" exception, *see* 7 U.S.C. § 2 (1988) [1] (exempting transactions for "any sale of any cash commodity for deferred delivery or shipment").

The first two of these contentions can be dismissed with little difficulty. As MG points out in its papers, the trade option exception was meant to be a "narrowly defined" and "very limited exception" to the general rule set forth in § 4a of the CEA, which prohibits the trading of commodity options through unregulated markets. *See* Policy Statement Concerning Swap Transactions, 54 Fed.Reg. 30694, 30694 (CFTC July 21, 1989) (referring to trade option exemption as "narrowly defined" exception to CEA); CFTC Interpretive Letter No. 84–7, [1982–1984 Transfer Binder Comm. Fut. L. Rep. (CCH) ¶ 22,025, at 28,595 (Feb. 22, 1984)] (referring to trade option exemption as "very limited exception" to CEA's general ban on unregulated options trading). To qualify as a "commodity option" at all, however, an instrument must give the offeree a right, but no obligation, to make or take delivery of a physical commodity at a fixed price and within a specified time. *See United States v. Bein,* 728 F.2d 107, 111–12 (2d Cir.1984); *CFTC v. U.S. Metals Depository Co.,* 468 F.Supp. 1149, 1154–55 (S.D.N.Y.1979); Characteristics Distinguishing Cash and Forward Contracts and Trade Options, 50 Fed.Reg. 39656, 39658 (CFTC Sept. 30, 1985). Although the Customers suggest that the flexie language makes them "offerees" of a "trade option", § 2 of these contracts unambiguously places an obligation on each Customer to take delivery sometime within the five or ten year terms set by the individual instruments. The blow-out provisions of these contracts are, moreover, only triggered in the event of a price spike. Be-

cause the flexies contain an obligation in all other circumstances, they cannot be considered options at all under the law, and so cannot meet an important threshold requirement for application of the CEA's trade option exception.

■ The flexies similarly fail to meet the very basic definition of a "swap" under the law, and so fail to meet the threshold requirement for application of the CEA's swap exception. As MG correctly points out, the CFTC has defined a "swap" as "an agreement between parties to exchange a series of cash flows measured by different interest rates, exchange rates, or prices with payments calculated by reference to a principal base." Policy Statement Concerning Swap Transactions, 54 Fed.Reg. at 30695; *see also* 17 C.F.R. § 35; Exemption for Certain Swap Agreements, [1992–94 Transfer Binder] Comm. Fut. L. Rep. § 25,539, at 39,592; Exemption for Certain Swap Agreement, 58 Fed.Reg. 5587, 5589 (CFTC January 22, 1993); *Procter & Gamble Co. v. Bankers Trust Co.,* 925 F.Supp. 1270, 1275 (S.D.Ohio 1996) ("[A] swap is an agreement between two parties ('counterparties') to exchange cash flows over a period of time."). By contrast, the flexies do either one of two things. Either they oblige the Customers to take delivery of petroleum at a set price in the future, in which case they function as agreements for the simple sale and delivery of commodities. Or, during a price spike, they give the Customers the right to cash out the contracts, in which case the Customers are entitled to receive a cash settlement based on a principal amount but are obliged to give MG no similar cash flow in return. In either case, although the CFTC has tended to take a rather liberal view of swaps in order to recognize "the diversity and evolving nature of swap transactions", *see* Exemption for Certain Swap Agreements, 58 Fed.Reg. at 5589, 5593, it would stretch the definition of a "swap" beyond recognition to include these transactions within its purview. The flexies therefore fail to meet the basic requirement

---

1. The CEA has been amended so that the language concerning exceptions for forward contracts now appears in § 1a(11), *see* 7 U.S.C. § 1a(11). This language is, however, identical to that of former CEA § 2(a)(1)(A), 7 U.S.C. § 2

(1988). Because the present action arose under the older statute, this opinion will continue to refer to the forward contract exception using its older numbering system.

for exemption under the swaps exception as well.

▮ Whether the flexies qualify for the "forward contract" exception thus presents the critical, and ultimately much more difficult, question. As both parties acknowledge, until at least 1990, the forward contracts exception was meant to exempt from CFTC jurisdiction any transaction in which "the desire to acquire or dispose of a physical commodity [was] the underlying motivation for entering [the] contract, [but in which] delivery may be deferred for purposes of convenience or necessity." *In re Stovall,* [1977–1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,778; *see also* Statutory Interpretation Concerning Forward Transactions, 55 Fed.Reg. 39188, 39190 (CFTC Sept. 25, 1990). By contrast, the "exclusion [was] unavailable to contracts of sale for commodities which [were] sold merely for speculative purposes and which [were] not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer [would] occur in the future." *CFTC v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 579 (9th Cir.1982). To determine whether a given contract was entered for one or the other reason, each transaction was "viewed as a whole, with a critical eye towards its underlying purpose." *Id.* at 581.

Given the nature of this test, the CFTC made it quite clear that there was no exhaustive list of elements that would serve to establish the existence of a forward contract. *See* Policy Statement Concerning Swap Transactions, 54 Fed.Reg. at 30694–95. Rather, the "overall effect" of a transaction as well as "what the parties intended" had to be examined in most cases. *See id.* Certain factors did, however, commonly contribute to a favorable finding, such as: non-standardized, individually negotiated terms, capacities on the part of the buyer to take and the seller to make delivery, routine physical delivery of the underlying commodities, absence of exchange-style offset provisions granting the counterparties a right to cash out the contracts, absence of any other settlement systems or rights of assignment under the contracts themselves, and marketing or sales only to commercial entities, who regularly dealt in the commodities at issue, rather than to the general public. *See, e.g., Co Petro,* 680 F.2d at 578, 580. Each of these factors were deemed to lend support to the notion that the underlying purpose of a given transaction was to effect physical delivery.

The Customers argue, however, that in its 1990 Statutory Interpretation Concerning Forward Transactions, 55 Fed.Reg. 39188, the CFTC radically revised this underlying purpose test and replaced it with a more "objective" one, under which MG's illegality defense must fail as a matter of law. Under this objective test, contracts should be considered legal forward contracts whenever they are entered into between commercial parties in connection with their businesses, and when the contracts set forth specific delivery obligations imposing on the parties substantial economic risks of a commercial nature. (*See* Def.'s Mem. at 27.) The first question to address is thus whether the underlying purpose test has been replaced.

The Customers cite the 1990 Statutory Interpretation because it effectively reversed the holding of Judge Conner in *Transnor (Bermuda) Ltd. v. BP North America Petroleum,* 738 F.Supp. 1472 (S.D.N.Y.1990), a case which involved the legality of the so-called "15–day Brent market", and upon which MG has partly relied in arguing for the relevance of the underlying purpose test. This case involved an unregulated and highly complex set of transactions, which were something of "a hybrid of a future contract[s] and forward contract[s]." *Id.* at 1489. Employing the traditional criteria and principles identified above, but emphasizing the routine physical delivery requirement, Judge Conner noted that there was an extremely low ratio of actual to negotiated deliveries in this market. *See id.* at 1490–91 (noting that contracts were "routinely settled by means other than delivery"). This ratio suggested to him that the underlying purposes of the transaction must have been "hedging, speculating and tax spinning." *Id.* at 1490. Judge Conner therefore held that the unregulated Brent activity was illegal under the CEA.

The CFTC ultimately disagreed with this holding. In its 1990 Statutory Interpretation, the CFTC explained that Congress had not yet provided enough guidance on the scope of the forward contracts exclusion:

in the content [sic] of today's commercial environment, including with regard to the concept of what constitutes delivery for the purposes of the exclusion ... From 1974 and with increasing frequency, there have evolved in the commercial segments of the economy a diverse variety of transactions involving commodities .... These transactions, which are entered into between commercial counterparties in the normal commercial channels, serve the same commercial functions as did those forward contracts which were originally the subject of the section 2(a)(1) exclusion notwithstanding the fact that, in specific cases and as separately agreed to between the parties, the transactions may ultimately result in performance through the payment of cash as an alternative to actual physical transfer or delivery of the commodity.

Statutory Interpretation Concerning Forward Transactions, 55 Fed.Reg. at 39191. The CFTC then held that the forward contract exclusion applied to transactions in the 15–day Brent market, as well as any other markets with analogous delivery mechanisms.

Although the Customers are correct to note that the 1990 Statutory Interpretation clarified that routine physical delivery under a contract is not an absolute precondition for application of the forward contract exception, the Customers overstate the CFTC's holding when they contend that this opinion marks an abandonment of the underlying purpose test altogether. The transactions examined in the 1990 Statutory Interpretation involved commercial buyers and sellers of crude oil, who entered into sometimes lengthy "chains" of transactions rather than simple bilateral agreements. Because of the chain-like structure of this activity, counterparties in a given series would sometimes find themselves in multiple, offsetting positions with respect to one another, thus making it more convenient and less risky simply to cash out these posi-

tions and allow delivery to pass through one less layer of exchange. Still, "the market [itself] remain[ed] one based on physical trading", and each chain normally effectuated the delivery of crude oil. *Transnor*, 738 F.Supp. at 1489. The CFTC noted that title and bills of lading passed between the various members of a chain, as did "substantial risk[s] of a commercial nature", including those of "demurrage, damage, theft or deterioration of the commodity as well as other risks associated with owning the commodity delivered." Statutory Interpretation Concerning Forward Transactions, 55 Fed.Reg. at 39191. It was only in this specific context that the CFTC concluded that cashed-out 15–day Brent contracts ought to be considered agreements appurtenant to the more primary goal of obtaining deferred delivery of underlying commodities.

In fact, far from undermining the traditional forward contract analysis, the CFTC explicitly reiterated the proposition that to identify a forward contract, the "transaction[s] must be viewed as a whole, with a critical eye towards [their] underlying purpose." *Id.* at 39190 (quoting *Co Petro*, 680 F.2d at 581). The CFTC also reconfirmed that there is no definitive list of elements for determining this purpose, and that "[s]uch an assessment entail[s] ... a review of the 'overall effect' of the transaction as well as a determination of 'what the parties intended' " *Id.* Although the CFTC decided to de-emphasize the importance of routine physical delivery in discerning the purposes of the 15–day Brent contracts, the CFTC found it particularly salient, in reaching this decision, that the 15–day Brent contracts contained "no *right* of offset, [did] not rely on a variation margining and settlement system, and [did] not permit assignment of contractual obligations without counterparty consent." *Id.* at 39189 (emphasis added); *see also id.* at 39192 (noting that offsets resulted from "separate, individually negotiated, new agreements, [that] there [was] no obligation or arrangement to enter into such agreements, [and that they were] not provided for by the terms of the contracts as initially entered into"). The CFTC's decision thus indicated its expert opinion that contracts containing no rights to offset, but that are nevertheless

cashed out pursuant to separately negotiated agreements, should not be deemed to serve a speculative purpose just because they do not end in physical delivery.[2]

The other case that the Customers cite as overturning the underlying purpose test is *In re Bybee*, 945 F.2d 309 (9th Cir.1991). This case is, however, consistent with the above conclusion, and so is equally unavailing to the Customers' position. In *In re Bybee*, the Ninth Circuit examined a set of contracts for the delivery of precious metals that were entered into between Keith D. Bybee and A–Mark Precious Metals, Inc. Under one type of contract (the "Immediate Delivery or Sales Purchases"), Bybee routinely took delivery of the underlying commodities and paid for them up front. Under the other (the "Deferred Delivery (margin) Sales"), Bybee was given the right to buy the goods by paying an initial down payment, and was then given a two year period to pay the remaining balance. Delivery was only to be effectuated upon full payment, however, and A–Mark was to hold the goods in storage and retain a lien on them until that time. After entering into a number of these Deferred Delivery (margin) Sales, Bybee began to encounter extreme financial hardships, which ultimately forced him to settle his debt with A–Mark by selling A–Mark all of the goods that were still held in his name. Although these contracts never ended in physical delivery, Bybee's contracts were cashed out pursuant to individually negotiated agreements, much like the 15–day Brent contracts, and Bybee never had a right to cash settle in lieu

of taking delivery. *See id.* at 314 (noting that "there is no obligation to enter into such [offsetting] agreements, [and] they are not provided for by the terms of the [original] contracts"). When the Ninth Circuit held that the Deferred Delivery (margin) Sales should be deemed legal forward contracts, it cited the 1990 Statutory Interpretation. Thus *In re Bybee* seconds the proposition already established in the CFTC's 1990 Statutory Interpretation, that when contracts for future delivery give neither party a right to cash out, but are still cash settled pursuant to independently negotiated agreements, absence of physical delivery alone should not be deemed to imply that the contracts served merely speculative purposes. The underlying purpose of a transaction is, however, still the touchstone of the forward contract analysis. *See, e.g., CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772–73 (9th Cir.1995); *CFTC v. Standard Forex*, 1996 WL 435440, at *10 (E.D.N.Y. July 25, 1996) (Sifton, C.J.).[3]

The Customers also present an alternative, but equally unavailing, argument for the contention that the flexies' unambiguous language makes them legal forward contracts under the law. Namely, the Customers point out that the petroleum products specified in the flexies qualify as "cash commodities," that section 3 of the flexies refers to a "sale" of these commodities, and that section 2 allows any deliveries under the flexies to be deferred. The Customers argue on this basis that the flexies fit squarely within CEA § 2(a)(1)(A)'s definition of a legal forward

---

**2.** Although the CFTC did not make clear its rationale for distinguishing contracts that are offset pursuant to separately negotiated agreements and contracts that are offset pursuant to entitlements deriving from the original contracts themselves, this distinction makes sense for the purpose of identifying speculative transactions. When a contract is offset pursuant to a separately negotiated agreement, a party can bargain only for the present cash value of that acceptance, and so can place itself only in the same expected economic position as if it had retained the obligation to take delivery. When, on the other hand, a contract is offset pursuant to rights that a party has bargained for at the inception of an agreement, this party obtains a right to offset on terms that may be more beneficial and may ultimately exceed the cash value of the acceptance obligation at the time of the offset. In

some cases, this right will allow parties to reap in speculative benefits that are wholly distinct from the normal risks associated with the deferred delivery of commodities.

**3.** Although the Ninth Circuit nowhere mentions this fact, the holding in *In re Bybee* may also have been influenced by the fact that Bybee was in circumstances at or near insolvency. Since well before 1990, contracts providing for rights to offset in certain "bona fide hedging" circumstances have been distinguished from speculative transactions and have been excepted from CEA regulation. *See, e.g., Corn Products Refining Co. v. Benson*, 232 F.2d 554, 556 (2d Cir.1956). Under 17 C.F.R. 1.3(z), transactions that are cashed settled in light of a bankruptcy are still considered "bona fide hedging transactions."

contract as one for "any sale of any cash commodity for deferred shipment or delivery." The features that the Customers point to are, however, insufficient to justify this classification. Indeed, if these features were enough, then every illegal off-exchange futures contract would fit within the exception for legal forward contracts because an illegal off-exchange futures contract is itself defined as a "contract of a sale of a commodity for future delivery." 7 U.S.C. § 6(a)(1). The CFTC has thus explained in *In re Stovall:*

> [W]ere we unable to look beyond the terms of an instrument drafted in clear and unambiguous language *to determine the true intent of the parties* to a contract, it might be impossible for us to distinguish between a commodity futures contract and those falling within the exclusionary language of Section 2(a)(1). Indeed, the language in futures contracts presently traded on markets designated by the Commission does on its face appear to fall within the Section 2(a)(1) exclusion. Surely, Congress would not have charged us with the responsibility of discriminating between two classes of transactions yet left us without the ability to do so.

[1979–1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 23,782–83 (emphasis added). Thus, to see if a contract qualifies as a legal forward contract, courts must examine its underlying purposes, even when the contract's provisions seem to qualify it for an exemption under the language of § 2(a)(1).

Because the Customers have failed to establish either of the arguments necessary to undermine the underlying purpose test and show that the flexies are legal forward contracts, and because the Customers have also failed to establish that the flexies are either exempt swaps or trade options, this Court denies the Customers' motion for summary judgment on the issue of illegality.

### b. MG's Motion for Summary Judgment on the Illegality Defense

■ MG argues that when applied to the facts produced thus far in discovery, the underlying purpose test entitles MG, rather than the Customers, to summary judgment on the defense of illegality. If the flexies were viewed in isolation, this Court might be inclined to grant MG's motion against most of the Customers in this case. This is because the record contains overwhelming and nearly uncontradicted evidence that the flexies were never thought of as ways independently to effectuate physical deliveries. Although the right to cash out the flexies was triggered only during price spikes, the record contains ample evidence, for example, that the chance of a price spike occurring within the terms of the flexies was objectively very high,[4] and price spikes sufficient to trigger the blow-out provisions did in fact occur in every case. Moreover, when these spikes occurred in 1996, every single Customer asked to cash out the flexies, and no delivery has ever occurred under a flexie. Unlike in the 15–day Brent market and *In re Bybee*, however, all of the relevant cash settlements were requested pursuant to entitlements laid out in the blow-out provisions of the original contracts. Because the rights to cash out derived from the original contracts, rather than from individually negotiated agreements, this overwhelming absence of physical delivery is indicative, though not conclusive, of a speculative purpose in entering into the flexies.[5]

---

4. The record contains testimony suggesting that during the five-year period immediately preceding the issuance of the flexies, the NYMEX reference price exceeded the "blow out" price no less than 33 times for unleaded gasoline and 11 times for diesel fuel. (*See* Vaughn Aff.1998 ¶ 2.)

5. At one point, the Customers argue that an offset must be "exchange style" in order to subject the contract in which it appears to CEA regulation. This argument is offered as a reading of the CFTC's objective test, however, and this test has already been rejected. Once the relevance of the underlying purpose test has been

granted, an offset of the sort found in the flexies should clearly be deemed to provide some evidence of a speculative purpose, and the CFTC has thus said that "[a]lthough the opportunity for offset has been recognized as an essential element of futures contracts, it has not been deemed essential that the offset be accomplished in a manner identical to that utilized in exchange-traded futures." *In re First Nat'l Monetary Corp.,* CFTC Nos. 79–56 and 79–57, 1985 WL 55299, at *5 (CFTC Aug. 7, 1985) (citing *Co Petro,* 680 F.2d at 580).

The record also contains direct deposition testimony, from some or all of the Customer representatives who negotiated the flexies with MG, that the Customers expected a price spike to occur, that they never intended to take delivery under the contracts, and that they hoped to cash out the contracts and make money on future price fluctuations. (*See, e.g.,* Knight Dep.[6] at 119, 122–23, 160–61, 163 (admitting belief that price spikes were "anticipated" and that they planned to "sell the position" if one were to occur); Mason Dep. at 57–58, 77, 107, 166–67 (admitting that he "was expecting to sell [out the contracts] when the price was right. Sometime during that period, [he] was expecting the price to be right."); Hopkins Dep. at 67–68 (saying that he "had no expectation of taking delivery"); Durbin Dep. at 192–93 (stating that flexies "would never last more than 18 months on the outside"); Mitz Dep. at 110, 115–16 (acknowledging that "at some point in time during the term of the contract ... [he felt he] would be able to liquidate the product and not have to take delivery"); Bailey Dep. at 22–23, 63, 87 (testifying that he "expected ... they would be able to exercise the sellout option prior to the 10–year expiration" and that "when the NYMEX price hit a certain level, [they] would sell the contracts"); Martin Dep. at 88–90, 135–36, 155 (agreeing that there was "very little risk of having to take delivery" under the flexies because "[m]ost likely, given the history of the market, [prices] would spike; [the flexies] would be liquidated; [and they] would share in the profits ...."); Ellington Dep. at 93–96, 151 (admitting belief that there was "very little risk" of having to take delivery under the flexies); Pomeroy Dep. at 80, 93–94 (noting intention to sell the contracts if the price were to spike and testifying to having seen price spikes "many times"); Beall Dep. at 126–27 (stating that he thought it "likely" that he would be able to exercise the blow-out provisions); Gettelfinger Dep. at 116 (saying he assumed they would cash out the flexies within their 10 year periods).)

This same evidence suggests that in its sales and marketing pitches, MG urged that there was little risk of ever having to take physical delivery in the future. (*See, e.g.,* Bailey Dep. at 22 ("I was basically led to believe that we would never have to take delivery of that product because that selling price would be hit based on those graphs that he showed me."); Martin Dep. at 89 ("[T]he gist of the conversation was that on the 45–day contracts, that we had an opportunity to execute contracts for large quantities of product and there was very little risk of having to take delivery of this product, very little risk ...."); Wellington Dep. at 93 ("Mr. Donahue told me that this contract was not intended for delivery or, in other words, it was not a contract under which Super Service should expect to pull product."); Barrick Dep. at 56 ("[T]his program is designed to make you money when the market makes an upswing and you exercise your option to sell the contracts out."); Gettelfinger Dep. at 107 (Kelso Oil Co. "would never have to pull" product under a flexie because "it would be blown out some day.").) In a letter to one of the Customers, an MG salesmen described the flexies as follows:

> To summarize, this program is designed to make you money when the market makes an upswing and you exercise your option to sell the contracts out. It is not anticipated that you will ever have to pull any product physically.

(Pl.'s Mem. Ex. 8.) The record is, finally, replete with evidence that MG indicated in its sales pitches that the flexies would even be "rolled over", and their terms extended, if no price spike were to occur within their original terms. (*See, e.g.,* Gettelfinger Dep. at 106–07 ("He said that I would never have to pull it and that it would be blown out some day, and that if it went to the year 2004, that they would extend that contract for another five to eight years ...."); Beall Dep. at 153 ("I believe he said that, if the contract—if we hadn't pulled the contract or it hadn't sold by the 10 years, that they could roll it over for five more years."); Durbin Dep. at 55, 124–25 ("I was told that they could roll it forward almost forever."); Mason Dep. at 58 ("[T]he salesman had said that if they didn't go up within that time period, they ... could be rolled over for an additional five years, but

---

6. Citations to deposition transcripts appear as "Dep. at ____."

there is no guaranty on that."); Hopkins Dep. at 65–67 (MG salesman said "he would try to roll over the contract" if "the market price did not go above 62 cents during the 10 years."); Martin Dep. at 155–56 (MG salesman gave "the assurance that if that was going to present a hardship for myself or my company, that they would roll the contracts for an additional five years.").) All of these facts tend to support the conclusion that there was never any intent at all to take delivery under the flexies, and that their overall purpose was to allow for speculation on the petroleum futures market.

By contrast, most of the evidence cited by the Customers to rebut this conclusion goes to merely ancillary matters. For example, the Customers cite ample evidence suggesting that their representatives understood that they may have to take delivery, if a price spike were never to occur within the relevant time periods, and that the Customers set the volume terms to levels low enough to fit within their respective capacities to take (or at least resell) sometime near the end of the contracts' terms. (*See* Def.'s Opp. at 12–14; Def.'s Rule 56.1 Statement ¶ 44.) Even when viewed in a light most favorable to the customers, however, this evidence tends to show only that the Customers understood their objective obligations under the contracts and were prepared to fulfill them in one possible eventuality. Without pointing either to evidence rebutting MG's claim that this eventuality was viewed as highly unlikely, or to more direct evidence suggesting that the Customers meant to take delivery under the flexies even in the event of a price spike, this Court doubts that a reasonable juror could infer from the present record that the Customers ever proposed to take delivery under the terms of the flexies themselves.[7]

"[S]ummary judgment is [however] rarely appropriate when subjective matters such as intent are material", *see Abrams v. United States,* 797 F.2d 100, 105 (2d Cir.1986), and the record does contain some evidence that may be more helpful to the Customers' underlying position. Namely, the record contains evidence that the flexies may have been negotiated as part of larger transactions, which included the sale not only of flexies but of certain ratable contracts. In its Confidential Descriptive Memorandum on Energy Marketing Operations and Investments, for example, MG describes certain offsetting options as "risk management systems," which are meant to allow end users of energy products flexibly to "manage profit margins while reducing [the] risks" inherent in taking products for future delivery. (Def.'s Mem. Ex. 40, at 3.) MG's former president Arthur Benson also admitted that he brought "the concept of using hedges on the NYMEX in connection with offering long-term contracts" from his place of prior employment and has explained:

> We were offering our customers a risk management situation in which we tried to fix their price at a level that we thought would be attractive when the market was in the lower third of what we perceived to be its normal pattern.

(Benson Dep. at 17–18.) The notion of "hedging," however, unlike that of "speculating," means "to limit the financial risk of (e.g., a bet) by a counterbalancing transaction," *see American Heritage Dictionary* 389 (3d ed.1994), and it is undisputed that physical delivery occurred under the ratable contracts on a regular basis. When viewed as part of these larger, ongoing transactions, some of the descriptions of the transactions between MG and the Customers might thus be read to suggest that the flexies were

---

7. This Court has found only two Customers that can point to any further evidence of this sort. When deposed on behalf of Gas America Services, Inc., Richard White was asked if "[under the flexie contracts, ... Gas America [had] the intention of taking delivery of fuel," and responded, "I guess I'd have to say yes to that." (*See* Def.'s Mem. Ex. 32, at 226.) Similarly, Jerry R. Walton, when deposed on behalf of JB Hunt Transport, Inc., stated that he "viewed these [45-day] contracts as contracts to purchase fuel at prices that we felt were good prices over a 10-year period." (*See* Def.'s Mem. Ex. 3, at 43.) Walton also testified that he did not "view ... these contracts as incremental paper-based hedges." (*Id.* at 44.) Whether these statements, alone and without any other factual support in the record of events, could defeat summary judgment by raising an inference of non-speculative purpose is a close question, which the Court need not address because summary judgment is inappropriate on other grounds.

viewed by both as instruments for insuring against certain price fluctuations that might arise as petroleum was delivered under the terms of the ratable or other contracts. (*See, e.g.,* Def.'s Mem. Ex. 63, Knight Dec. ¶¶ 6–8 (referring to flexie program as providing a "contractual safety blanket" for commercial dealers who will be taking deliveries on an ongoing basis over long periods of time).) This sort of conclusion would, in turn, be strengthened by the facts that both parties are commercial dealers, and that none appeared to deal regularly on any orthodox futures markets.

In light of the underlying purpose test, and heeding the CFTC's acknowledgment that commodities markets have been evolving to meet increasing complex needs through increasingly complex markets, a critical set of questions therefore remains. Were the flexies entered into by commercial dealers, who were primarily in the business of buying and selling petroleum, but who were also willing to seize on the opportunity to speculate on an unregulated futures market price, thereby obtaining a second source of income? Or were the flexies entered into primarily as ways of "shift[ing] future price risks incidental to commercial operations and other forward commitments," which involved the transfer of unleaded gasoline and heating oil? *See* Statutory Interpretation Concerning Forward Transactions, 55 Fed.Reg. at 39191. To answer these questions, a decision-maker will have to look not only at the contract language itself but at what was happening in and around the negotiations of all the contracts, and in particular of the flexies. Because this inquiry will require the relevant decision maker to weigh the evidence, assess the credibility of its various sources, and reconcile any inconsistencies that may arise, the inquiry is one that lies squarely within the province of the jury, and MG's motion for summary judgment is denied.

### 2. The Affirmative Defense of Impossibility

■ The Customers also argue that MG's impossibility defense is foreclosed as a matter of law because the impossibility at issue was generated by a governmental order to which MG gave its consent. If, however, the affirmative defense of illegality is established at trial, MG will have proven grounds sufficient to defeat the breach of contract claims in this case, and it will be unnecessary to reach the question of impossibility. Thus the only question that this Court needs to address is whether an impossibility defense should be dismissed as a matter of law when it is based on a consent order that forbids a legal act.

As discussed in this Court's previous opinion, *see In re MG Refining & Marketing, Inc. Litigation,* No. 95 Civ. 2512(SS), 1997 WL 23177, at *6 (S.D.N.Y. Jan.22 1997), the rule in New York is that although governmental orders barring an action are normally grounds for an impossibility defense, impossibilities caused by such orders "will excuse a party's performance only if the fault of the party owing performance did not contribute to the order." *Lowenschuss v. Kane,* 520 F.2d 255, 265 (2d Cir.1975). This fault standard has been taken to entail that parties who fail to challenge vigorously a governmental action, or who still have some chance of controlling its outcome, will be unable to cite the resulting order as grounds for a successful impossibility defense. *See Organizacion JD Ltda. v. U.S. Dept. of Justice,* 18 F.3d 91, 95 (2d Cir.1994) ("The defense of impossibility extends to judicial action so long as the party seeking to be excused has not caused or *failed to prevent* the judicial action." (emphasis added) (citations omitted)); *see also Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1992) ("Health–Chem makes no claim that it took virtually every action within its power to perform its duties under the contract and therefore cannot assert the defense of impossibility."); *United States v. International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO,* 816 F.Supp. 864, 874 (S.D.N.Y.1992) ("In contract law . . . the defense of impossibility is not available to one who . . . did not take virtually every action within his or her power to perform."); *J.J. Cassone Bakery, Inc. v. Consolidated Edison Co.,* 168 Misc.2d 272, 279, 638 N.Y.S.2d 898, 904 (N.Y.Sup.Ct.1996) ("To excuse the promisor's performance by reason of a supervening act, it is generally understood

that such act was unforeseeable when the contract was created, the events causing the result were fortuitous and beyond the control of either party to the contract and the event, when it occurred, was *vigorously challenged* by diligent efforts of the promisor to *avoid the consequences of impossibility* " (emphasis added).), *rev'd in part on other grounds*, 240 A.D.2d 634, 659 N.Y.S.2d 293 (N.Y.A.D.2d Dept.1997).

Because consent decrees are by definition the results of actions that could have been further challenged, the above principles have a direct application to the question of whether consent decrees can be considered sufficient to ground a defense of impossibility. Namely, an order issued with a party's consent is usually considered insufficient, at least when the defense is raised against persons who were not parties to the original actions. *See General Aniline & Film Corp. v. Bayer Co.*, 305 N.Y. 479, 483, 113 N.E.2d 844, 846, (N.Y.1953) ("Whatever the rule might be if the plea were based upon a decree rendered in a contested action, the [impossibility] defense lacks validity where, as here, the judgment was entered upon defendant's consent."); *see also Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2d Cir.1975) ("Since this court order, an attachment of Kama Rippa's indebtedness to Melanie, was procured by Kama Rippa itself, a defense of impossibility is as audacious as it is frivolous"); *Bank of Canton v. Republic of National Bank of New York*, 509 F.Supp. 1310, 1320 (S.D.N.Y.1980) ("[T]he consent to the injunction given by [the defendant] brings the case squarely within the *General Aniline* decision."), *aff'd*, 636 F.2d 30 (2d Cir.1980); *United States v. Carrols Dev. Corp.*, 454 F.Supp. 1215, 1220 (N.D.N.Y.1978) ("[B]y virtue of the fact that Carrols has voluntarily consented to the entry of the Proposed Judgment, it will not be able to rely upon the doctrine of impossibility of performance to avoid its obligations under the lease and covenant agreements."), *modified on other grounds*, 1981 WL 2184 (N.D.N.Y. Oct.16, 1981). Under the rule established by this long line of cases, MG's

impossibility defense should be dismissed as a matter of law.

MG has, however, pointed to one case that presents an exception to this general rule governing consent decrees. In *Harriscom Svenska, A.B. v. Harris Corp.*, 3 F.3d 576 (2d Cir.1993), the Second Circuit examined a situation in which the U.S. Customs Service officials had detained a shipment of RF Systems' [i.e., a manufacturing division of Harris's] model 2301 radio spare parts, which had been ordered by Harriscom and were bound for Iran. Although a 1982 determination by the United States Department of Commerce clearly established that these radio parts were exportable to almost any country, the government later prohibited the sale of anything it considered military equipment to Iran.[8] Later, the government decided to begin commodity jurisdiction proceedings against Harris to decide whether this particular radio was a "military product," which should be on the Munitions List and thus be subject to more stringent export controls to all foreign countries. During the course of the proceedings, it became apparent that the government was more concerned with the export of these parts to Iran than their more general classification as "military products." Harris was thus able to negotiate a settlement with the government, according to which these radio parts were kept off the Munitions List but Harris was forbidden from fulfilling five of its eight outstanding deliveries to Iran and from making any further sales to the Iranian market. Later, Harris cited this consent order to establish an impossibility defense against certain breach of contract claims, which arose out of the five unfulfilled delivery transactions.

The Second Circuit allowed Harris an affirmative defense of impossibility in these circumstances, noting that there was "overwhelming and uncontradicted evidence that the government would not allow RF Systems to continue sales to Iran." *Id.* at 580. The Court explained:

---

8. By its terms, this prohibition covered anything that the government considered to be military equipment, and not just those "military products" that qualified for technical inclusion on the Munitions List.

We think it a foregone conclusion that a government bureaucracy determined to prevent what it considers military goods from leaving this country and with the will to compel compliance with its directives is like an irresistible force, one that cannot reasonably be controlled. The government in these circumstances may be likened to the wife of "Rumpole of the Bailey," John Mortimer's fictional barrister, who describes his wife as "she who must be obeyed."

*Id.* at 577.

MG argues that *Harriscom* should be read not for the limited proposition that an impossibility generated by a consent order can defeat a breach of contract claim only when the order bars a patently forbidden act, but rather for the much broader proposition that an impossibility defense is warranted when resistance to a governmental action becomes commercially impracticable. In support of this view, MG notes that *Harriscom* was decided under the U.C.C. and argues that the U.C.C. test for impossibility, which is embodied in § 2–615, is much more lenient than that of the common law. MG points out that according to comment 10 to U.C.C. § 2–615, "[t]he seller's good faith belief in the validity of the regulation is the test under this Article and the best evidence of his good faith is the general commercial acceptance of the regulation." MG also cites *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.* for the proposition that the relevant test for good faith is whether, under all the facts and circumstances, the "promisor acted reasonably in failing to perform." 532 F.2d 957, 996 n. 107 (5th Cir.1976) (cited with approval in *Harriscom*, 3 F.3d at 580). MG thus urges that its impossibility defense cannot be dismissed until trial evidence has been presented concerning its good faith in consenting to the CFTC Order, as well as the general commercial practices in the petroleum industry with regard to litigating adverse governmental actions. (*See* Pl.'s Opp. at 29.) MG also cites evidence suggesting that further litigation might have put the legality of the ratables into question as

well, and that MG depended on these contracts for its future commercial livelihood. (*See id.* at 31–34.)

MG's position ultimately amounts to the idea that the U.C.C.'s good faith standard can be used to identify a class of actions, without which an alleged impossibility would arise, but that are also so costly or economically risky that it would be commercially impracticable to require them of a party. Comment 4 to U.C.C. § 2–615 raises some initial doubts as to whether MG's interpretation of the U.C.C.'s good faith standard is not overly broad, however, because comment 4 says that "[i]ncreased cost alone does not excuse performance *unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance*" (emphasis added); *cf. Rivas Paniagua, Inc. v. World Airways, Inc.*, 673 F.Supp. 708, 713 (S.D.N.Y.1987) ("Whatever broad categories of circumstances might justify reliance on the excuse of impossibility under New York's generally restrictive standard, it is clear that a circumstance created by a party's own economically motivated action cannot be a basis for reliance on the impossibility defense.") More importantly, comment 10 says that "any action by the party claiming excuse which *causes or colludes* in inducing the governmental action preventing his performance *would be in breach of good faith and would destroy his exemption*" (emphasis added). Clearly, for this comment to have meaning, and for it to be anything more than an empty tautology, the sorts of actions that it describes as "causing" a governmental action must be identifiable independently of the good faith standard reflected in § 2–615. Where, for example, a party consents to an order forbidding a legal act the question of whether this consent constitutes the legal cause of the resulting order, and so whether it extinguishes the grounds for a good faith impracticability defense, is a question that must be answered independently of whether MG has otherwise acted in good faith.[9]

---

9. MG also argues that the concept of fault has no applicability in the context of a claim for impossibility under the U.C.C. This Court, however, reads the concept of "cause," as it appears in comment 10, as a specification of this fault concept in the particular U.C.C. context.

In light of these facts, this Court need not decide whether *Harriscom* presents a narrow exception to the common law standard for impossibility or whether it reflects a more lenient U.C.C. test. In either case, a party will lose its impossibility defense if it has caused the order that makes performance impossible. This Court must presume, moreover, that but for a party's consent, an order forbidding the party from performing a legal act would never have resulted from an adverse action. This consent must therefore be considered the legal cause of any resulting impossibility. The holding in *Harriscom* is, in fact, no exception to this rule. *Harriscom* depended critically on the fact that a prohibition on sales to Iran was a "foregone conclusion" given the "overwhelming and uncontradicted evidence" from the record. In these kinds of circumstances, the order at issue would presumably have been entered even if the party claiming impossibility had never consented, and so this consent cannot be deemed the legal cause of the order. This fact explains why Harris did not automatically lose its impossibility defense, and why the court was able to employ the relevant test for impossibility and grant the defense, after noting that there was also "no evidence [in the record] that RF Systems acted in bad faith." *Harriscom,* 3 F.3d at 580. Whether or not *Harriscom* elaborates a test for commercial impossibility that diverges significantly from the common law, the case therefore provides for an exception to the rule against impossibility defenses based on consent orders, but only in the limited circumstances where the consent has played no role in causing the order.[10]

As stated before, MG's impossibility defense will only be pertinent to this case if the flexies are found legal at trial. In such a case, there would be no doubt that MG's consent caused the CFTC Order, and the order would thus be insufficient to establish a defense of impossibility. MG's impossibility defense must therefore be dismissed as a matter of law.[11]

### CONCLUSION

For the reasons discussed, the Court denies the Customers' motion for summary judgment dismissing MG's illegality defense because the test for whether these contracts are illegal will require a fact-finder to look at the purposes underlying the instruments. The Court also denies MG's motion for summary judgment on the basis of its illegality defense because there is still a genuine issue

---

**10.** Because this analysis distinguishes between consent to orders barring illegal and legal acts, it may seem to conflict with comment 10 to U.C.C. § 2–615, which states that the relevant impossibility standard should not "make the present action of the seller depend upon the eventual judicial determination of the validity of the particular governmental action." There is, however, no genuine conflict here. All defenses of impossibility depend upon the occurrence of an event that was unforeseen at the time of contracting, and all defenses citing governmental actions must therefore presuppose that the parties viewed performance as legal at that time. The paradigm case of a governmental action causing an impossibility is thus the situation where a governmental agency passes a new law or regulation prohibiting performance sometime between the point of contracting and performance. Comment 10's language then implies that a party will have an impossibility defense even if the law is ultimately invalid, so long as the party has a good faith belief that it is valid and bars the performance at issue. According to comment 10, "the best evidence of this good faith is [in turn] the general commercial acceptance of the regulation." Even if the law is valid, however, comment 10's language concerning causation shows that a party will lose this defense altogether if the party has caused or colluded in passing the law, as would most likely be the case where the party has engaged in substantial lobbying.

Comment 10 says that it "disregards any technical distinction between 'law,' 'regulation,' 'order' and the like." Thus an order—much like a regulation—will only be a candidate for an impossibility defense if the party asserting the defense viewed performance as legal at the time of contracting but views an intervening action or order as establishing that this performance is forbidden. Even an invalid order can then serve as the grounds for a successful impossibility defense, so long as the party believes it to be valid in good faith. Once again, however, a party will lose this defense altogether if it has caused the order, as will always be the case where a party consents to an order forbidding a legal act.

**11.** The Customers also argue from the principle that a party should not be able to profit from its own wrongdoing that MG's actions in marketing the flexies disentitle it from asserting an impossibility defense. The Court need not address this argument, however, because MG's impossibility defense has already been dismissed on other grounds.

of material fact concerning the underlying purposes of the flexie contracts. The Court grants the Customers' motion for summary judgment dismissing MG's impossibility defense because, under the only set of assumptions in which impossibility is relevant to this case, MG's defense is premised on an order that was caused by MG's consent.

The Court directs the parties to appear for a conference before Judge Richard C. Casey, in courtroom 17B on November 13, 1998 at 10:00 am, with a new case management plan addressing what discovery, if any, remains in light of this opinion.[12] If no discovery remains, the parties should be prepared to advise the Court about their and their witnesses' availability for trial during the next six months.

**SO ORDERED.**

---

**12.** The Court's dismissal of MG's impossibility defense renders moot the parties' dispute over the attorney-client privilege claim.