CARY OIL CO., INC., et al., Plaintiffs,

v.

MG REFINING & MARKETING, INC., et al., Defendants.

No. 99 Civ. 1725(VM).

United States District Court, S.D. New York.

April 24, 2003.

Richard G. Tashjian, Tashjian & Padian, New York, NY, for plaintiffs.

Robert B. Bernstein, Kaye, Scholer, Fierman, Hays & Handler, L.L.P., New York, NY, for defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Before the Court are seven motions in limine (the "Motions") submitted by Plaintiffs and Defendants in connection with the trial of this matter, scheduled to begin on May 5, 2003.

As discussed in the Statement of the Court Regarding Certain Motions in Limine of Plaintiffs and Defendants, dated April 24, 2003,[1] which is attached hereto and incorporated by reference herein, the Court denies six of the Motions and grants one Motion. Accordingly, it is hereby

**ORDERED** that the Plaintiffs' Motion to Compel Production of Defendants' Records with Respect to Payment of Expert Witnesses is denied; and it is further

**ORDERED** that the Plaintiffs' Motion to Exclude Consent Order, Reference to its Terms and Content, and Evidence of CFTC Negotiating Positions is denied; and it is further

**ORDERED** that the Plaintiffs' Motion to Exclude References to Religious Affiliation of MGAG's Founders is denied; and it is further

---

1. The Court notes that the Statement which was provided to the parties at the pre-trial conference held on April 23, 2003 did not contain the Court's response to (1) Plaintiffs' Motion to Exclude Evidence, Argument and Expert Opinion on Whether Plaintiffs Would Have Behaved Optimally Had the Contracts Not Been Breached and (2) Defendants' Motion to Exclude The Proposed Expert Testimony of Alexander Triantis, both of which are contained in the Statement attached hereto.

**ORDERED** that the Plaintiffs' Motion to Exclude Evidence and Argument on Mitigation of Damages is denied; and it is further

**ORDERED** that the Plaintiffs' Motion to Exclude Evidence and Argument on Waiver, Agreement to Rescind and Equitable Estoppel is granted; and it is further

**ORDERED** that the Plaintiffs' Motion to Exclude Evidence, Argument and Expert Opinion on Whether Plaintiffs Would Have Behaved Optimally Had the Contracts Not Been Breached is denied; and it is finally

**ORDERED** that the Defendants' Motion to Exclude The Proposed Expert Testimony of Alexander Triantis is denied. **SO ORDERED.**

### ATTACHMENT

### STATEMENT OF THE COURT REGARDING CERTAIN MOTIONS IN LIMINE OF PLAINTIFFS AND DEFENDANTS

The Court has considered certain motions in limine submitted by Plaintiffs and Defendants in connection with the trial of this matter, which is scheduled to begin on May 5, 2003. The Court will briefly state the findings and reasoning supporting its decision regarding each separate motion in limine.

### I. PLAINTIFFS' MOTIONS

A. *MOTION TO COMPEL PRODUCTION OF DEFENDANTS' RECORDS WITH RESPECT TO PAYMENT OF EXPERT WITNESSES*

Plaintiffs move to compel Defendants to produce their communications with certain expert witnesses concerning the experts' retention by and payments from Defendants. The two experts that Plaintiffs target, Professor Stephen Ross ("Ross") and Dr. Philip Verleger ("Verleger"), issued separate reports in a 1995 arbitration by

Defendants against Arthur Benson, Defendants' former President (hereinafter, the "Ross 1995 Report" and the "Verleger 1995 Report," respectively, and together, the "1995 Reports"), and then again in relation to the instant case (hereinafter, the "Ross 2001 Report" and the "Verleger 2001 Report," respectively, and together, the "2001 Reports"). Plaintiffs' implied purpose in examining Defendants' compensation to Ross and Verleger is to assess whether such compensation may have motivated the experts to materially change their opinions with respect to essentially the same issue from the time of the 1995 Reports to the 2001 Reports in order to suit the Defendants' evidentiary needs in each legal proceeding. The Court is persuaded that such records should be available to either party if a sufficient basis for the existence of possible bias is asserted. However, the Court is not satisfied that an adequate showing is presented here with respect to either Ross or Verleger, and therefore denies Plaintiffs' motion.

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires that a party shall disclose "the compensation to be paid for the [expert's] study and testimony." While most expert reports disclose the expert's hourly rate, the plain language of the rule clearly refers to the expert's "compensation," which encompasses more information than simply a billing rate. *See Amister v. River Capital Int'l Group, LLC*, No. 00 Civ. 9708(DCDF), 2002 WL 2031614, at *1 (S.D.N.Y.2002) ("Although it may be common for attorneys to consider [Rule 26(a)(2)(B) ] satisfied by the disclosure of the expert's hourly rate, the rule on its face refers to the expert's 'compensation,' not to the expert's billing rate."). This requirement should be considered in conjunction with the wide latitude courts tend to give cross-examiners in exploring a wit-

ness's bias or motivation in testifying. *See LNC Inv., Inc. and Charter Nat'l Life Ins. Co. v. First Fid. Bank,* No. 92 Civ. 7584(CSH), 2000 WL 1182772, at *2 (S.D.N.Y. Aug.21, 2000) ("In cross-examining [Plaintiff's] witnesses, counsel for Defendants are entitled to very considerable latitude in inquiring into circumstances that may show bias on the part of the witness in favor of the party calling him."). On this basis, the Court is persuaded that examining a witness's compensation in an effort to impeach for bias is permissible. *See Amster,* 2002 WL 2031614, at *1 ("[O]ther courts have ordered [compensation] disclosure ... on the grounds that an expert's compensation is not protected by any privilege or work-product immunity, and that the extent of the expert's financial interest in the case may be relevant to bias."); *see also Boselli v. Southeastern Pa. Transp. Auth.,* 108 F.R.D. 723, 725–27 (E.D.Pa.1985) (ordering disclosure of the experts' compensation in the case, and the total compensation paid to the experts over the prior three years).

■ However, in a complex litigation such as the one at hand, involving many expert witnesses, the Court is concerned that such disclosure requests could be abused by either party in an effort to harass both the other party by requiring significant document production and such party's expert witnesses by "rummaging through their personal and financial records under the guise of seeking impeachment evidence." *Wrobleski v. de Lara,* 353 Md. 509, 727 A.2d 930, 938 (1999). As a result, the Court agrees with *Wrobleski,* which asserted that such inquiries, "both at the discovery and trial stages, should be tightly controlled by the trial court and limited to its purpose." *Id.* The Court therefore applies this stated principle to prevent a flurry of compensation disclosure requests from either party designed to distract and impede the other party rather than assist in the preparation of cross-examination. Thus, in order to grant such a request, the Court requires the moving party to present a sufficient demonstration that, over a period of time, an expert's opinion has materially changed in such a way so as to raise a reasonable suspicion that the compensation paid to such expert may have affected the subsequent opinion.

■ Viewed in that context, the Court is not persuaded that Plaintiffs' request sufficiently makes such a showing. The Ross 1995 Report addressed, among other issues, the question of "whether the [Contracts were] properly valued" when first issued, (Expert Report on *Metallgesellschaft v. W. Arthur Benson,* dated September 1, 1995, attached as Exhibit 1 to Letter to Judge Victor Marrero, dated February 6, 2003 ("Letter"), at 18). The Ross 2001 Report, on the other hand, "assess[ed] the value of the [Contracts] as of July 27, 1995," nearly two years after the Contracts were issued. (Expert Report on Damages, *Cary Oil Co., Inc. et al. v. MG Refining & Marketing, Inc., et al.,* dated June 14, 2001, attached as Exhibit 2 to Letter, at 3.) Thus, the two different reports attach values to the Contracts at two different moments in the life of the Contracts: one valuation at issuance, and the other two years later at the time of the alleged breach. Consequently, the fact that the valuations in the reports are different is not only unsurprising, but expected. Under these circumstances, the Court does not agree with Plaintiffs that Ross necessarily "reach[ed] a strikingly different conclusion" in his 2001 Report as compared to his 1995 Report warranting further inquiry as to whether the change was improperly influenced by the level of his compensation. (Letter, at 2.)

The Plaintiffs' argument regarding the Verleger Reports is even less persuasive. Both the Verleger 1995 Report and the Verleger 2001 Report analyzed whether Defendants' customers had the financial abilities "necessary to pay above-market prices, as they might be required to for up to ten years[.]" (Expert Report of Philip K. Verleger, Jr. in the *Matter of Metallgesellschaft v. W. Arthur Benson*, dated September 1, 1995, attached as Exhibit 3 to Letter, at 57; *see also* Expert Report of Philip K. Verleger, Jr., dated June 15, 2001, attached as Exhibit 4 to Letter, at 11–12.) The Court finds no substantial difference in these two opinions. Since Plaintiffs do not actually articulate in the Letter how these opinions have changed, the Court rejects the Plaintiffs' requests to examine compensation records with regard to Verleger.

### B. *MOTION TO EXCLUDE CONSENT ORDER, REFERENCE TO ITS TERMS AND CONTENT, AND EVIDENCE OF CFTC NEGOTIATING POSITIONS*

Plaintiffs move to exclude the July 27, 1995 consent order (the "Consent Order") issued by the Commodity Futures Trading Commission ("CFTC"), and any testimony or statements about the CFTC's staff positions during negotiations with defendant MG Refining & Marketing, Inc. ("MG") over the Consent Order, from presentation to the jury. Plaintiffs contend that the Consent Order and the CFTC positions and conclusions are inadmissible hearsay, are irrelevant, and would confuse the jury and prejudice the Plaintiffs if admitted

into evidence. The Court disagrees, and thus denies Plaintiffs' motion.

■ The Consent Order resulted from an investigation by the CFTC's Division of Enforcement, which inquired into whether the Contracts were illegal off-exchange futures contracts.[1] The investigation continued until MG submitted an offer of settlement that the CFTC accepted and formally entered into on July 27, 1995. Under the Consent Order, the CFTC

> stopped the initiation of any full-scale enforcement proceedings against MG, assessed MG a $2.25 million penalty, established a series of oversight requirements for the corporation, declared the contracts to be 'illegal off-exchange futures contracts', and required MG to certify within five days that it had notified "all Purchasers of existing 45 Day Agreements that the Commission has entered this Order finding that the 45 Day Agreements are illegal and therefore void ... and directing [MG] to cease and desist from violating" the relevant sections of the CEA.

*MG Ref. & Marketing, Inc.*, 25 F.Supp.2d at 178 (citations omitted).

Based on the Consent Order, MG's President issued letters to certain customers, including Plaintiffs, claiming that MG was "barred ... from performance" under the flexies. *Id.* Later, when Plaintiffs asked to exercise their contractual rights to cash out all of their Contracts, MG refused to perform. *See id.* This refusal led to the instant lawsuit.

---

**1.** The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et seq., requires that futures contracts be marketed and entered into only through certain designated "contract markets," which must adhere to explicit CEA requirements. As a result, futures contracts which are entered into without the aid of a contract market are considered "illegal off-exchange futures contracts." *See MG Ref. & Marketing, Inc. v. Knight Enter., Inc.*, 25 F.Supp.2d 175, 178 (S.D.N.Y.1998).

■ Plaintiffs ask the Court to exclude from the trial all mention of the Consent Order and the proceedings that led to its issuance except for the single fact that MG entered into an agreement with the CFTC which barred performance of the Contracts. (*See* Plaintiffs' Pre–Trial Memorandum, dated March 27, 2003 ("Pl. Memo."), at 12.) Plaintiffs contend that any further discussion of the Consent Order could potentially bias the jury by creating the impression that the Contracts were found to be illegal by a government agency in an official proceeding and thus make the jury reluctant to rule otherwise on the Contracts' legality.

In the complex puzzle that the jury must piece together, the question of why Defendants entered into the Consent Order and what the Consent Order meant to the future of the Contracts is a crucial one. Indeed, Plaintiffs themselves rely on much of this history in constructing their veil-piercing argument, which alleges that Metallgesellschaft AG ("MGAG"), one of the Defendants who indirectly owned MG, controlled MG's decision to enter into the Consent Order and consequently should be partly liable for the purported breach of contract. In abiding by part of the Court's previous summary judgment ruling regarding issues of veil-piercing,[2] Plaintiffs have stated that they intend to introduce evidence that the decision to enter into the Consent Order was part of a well-planned MGAG strategy to avoid enforcement of the Contracts. (*See* Pl. Memo., at 12.) In addition, Plaintiffs intend to show the active role of MGAG management and counsel in the CFTC negotiations and the lack of involvement of MG's management. (*See* id.)

By introducing such evidence, Plaintiff requires Defendants to demonstrate to the jury what their motivations were in entering into the Consent Order so Defendants can refute the claim that the Consent Order was part of a plan by Defendants to avoid their legal responsibilities under the Contracts. Plaintiffs contend that Defendants' motivation should not be an issue for the jury to consider, and that instead the only issue the jury should be concerned about is what role MGAG's personnel played in directing the course of negotiations and deciding the time and terms of a settlement. (*See* Pl. Mem, at 5.) The Court is unclear about how any trier of fact could analyze the decision-making process that went into creating the Consent Order and not consider issues of motivation, especially when Plaintiffs point to the Consent Order as one piece in an alleged scheme by Defendants to unjustly unwind the Contracts. Thus, the Court is persuaded that the Consent Order and the process which created it should be a part of the evidence the jury considers.

■ In opposing such a conclusion, Plaintiffs claim that New York law does not require them to show bad faith, the commission of a fraud, or any sort of nefarious motivation on the part of any of the Defendants in order to prove that the corporate veil was pierced. Citing to several cases, Plaintiffs instead contend that they only need to prove MGAG controlled and dominated the decision that MG should enter into the Consent Order, which, Plaintiffs assert, automatically created a

---

**2.** In its prior summary judgment Decision and Order, the Court held that to pierce the corporate veil, the Plaintiffs had to prove "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; *and* (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Cary Oil Co., Inc. v. MG Refin. & Marketing, Inc.*, 230 F.Supp.2d 439, 458 (S.D.N.Y.2002) ("Cary Oil II").

breach of the Contract and thus fulfills the Court's test for veil-piercing. However, the cited cases actually disprove Plaintiffs' contention because they all involve defendants who committed some sort of duplicitous act or intentional and unjustified breach. *See, e.g., Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir.1991) (finding piercing appropriate where subsidiary of defendants reneged on deal to build a hotel); *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 849–50, 853 (2d Cir. 1985) (finding piercing appropriate where subsidiary of defendants had discharged plaintiffs in violation of their employment agreements in an act that did not technically constitute fraud but "comes very close to that"); *Network Enter., Inc. v. APBA Offshore Prod., Inc.*, No. 01 Civ. 11765(CSH), 2002 WL 31050846, at * 5 (S.D.N.Y. Sept.12, 2002) (observing that Second Circuit requires "commission of a fraud *or* wrong" to prove veil-piercing); *Accordia Northeast, Inc. v. Thesseus Int'l Asset Fund*, 205 F.Supp.2d 176, 182 (S.D.N.Y.2002) (defendants' deceptive practices, such as "impermissibly commingl[ing premiums] with other funds," were sufficient to sustain claim for piercing the corporate veil).

By contrast, the Defendants in the instant case claim that their breach was forced upon them by order of a governmental entity and therefore they did not intentionally breach a legal duty or commit a wrong, fraud or dishonest and unjust act. If Defendants' version of the facts was adjudged true by the jury, Plaintiffs—even if they established that MGAG controlled and dominated MG's decision to enter into the Consent Order—nonetheless would still have to satisfy the second prong of the Second Circuit's veil-piercing test: that such domination was used to commit a fraud or wrong that injured the party

seeking to pierce the veil. The Second Circuit clarified the meaning of this prong when it stated that

> even if a plaintiff showed that the dominator of a corporation had complete control over the corporation so that the corporation 'had no separate mind, will, or existence of its own,' New York law will not allow the corporate veil to be pierced in the absence of a showing that this control 'was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately caused the injury complained of.'

*Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1053 (2d Cir.1997) (citations omitted). The Second Circuit's phrasing illustrates its intention to equate a series of similar-themed concepts: (1) wrong, (2) fraud, (3) breach of a legal duty, and (4) a dishonest and unjust act. Numbers one, two and four all explicitly involve duplicity and unjust actions, and the inclusion of number three among these intentionally deceptive acts implies that the "breach of a legal duty" the Second Circuit refers to should be an intentional and unjust one as well, not just a breach caused by other legally valid motives. Plaintiffs' allegation that Defendants in effect conspired with the CFTC to create the Consent Order so Defendants could be released from their obligations under the Contracts offers such an illicit intent, but Plaintiffs must satisfactorily prove this intent and Defendants must be allowed to rebut such charges. As a result, the Court cannot accept Plaintiffs' theory that, to meet their burden to pierce the veil, they need only show a breach of contract without any showing of unjust intentions by MGAG.

 Plaintiffs contend that MG should not be permitted to introduce any sort of evidence regarding its motivations

in entering into the Consent Order because MG prevented Plaintiffs' inquiries about such motives during discovery by asserting the attorney-client privilege. Plaintiffs are correct that "the attorney client-privilege cannot at once be used as a shield and a sword." *U.S. v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991). In other words, Defendants cannot refuse to answer questions regarding their internal discussions and negotiations with the CFTC while invoking those same communications in mounting a defense.

However, the Court is not persuaded that this conflict needs to be resolved by eliminating any mention of the Consent Order. Instead, the Court is prepared to exclude any testimony or evidentiary presentations by the Defendants at trial if that same testimony or evidence was withheld from Plaintiffs during discovery based on attorney-client privilege. In coming to this conclusion, the Court remains consistent with precedent, in particular with regard to *Trouble v. Wet Seal, Inc.,* 179 F.Supp.2d 291 (S.D.N.Y.2001). In *Trouble,* the Court refused to let the defendant assert an advice of counsel defense because defendant had invoked attorney-client privilege throughout discovery, which automatically "constitutes a waiver of the advice-of-counsel defense." *Id.* at 304 (citing *Vicinanzo v. Brunschwig & Fils, Inc.,* 739 F.Supp. 891, 894 (S.D.N.Y. 1990)). Here, the Court is not dealing with the side issue of an advice of counsel defense and its explicit guidelines. Instead, the Consent Order and the process that created it are central to the instant case and must be addressed by both parties. Thus, Defendants can discuss these issues, consistent with the Court's rulings in this matter, but to the extent that Defendants have withheld facts from discovery that relate to the Consent Order, they

will not be allowed to introduce such facts in any form at trial.

Plaintiffs also contend that this Court has already ruled against the admissibility of the Consent Order in two related cases, *In re MG Refin. & Marketing, Inc.,* No. 94 Civ. 2512(SS), 1997 WL 23177 (S.D.N.Y. Jan. 22, 1997), and *MG Refin. & Marketing, Inc. v. Knight Enter., Inc.* However, those cases considered the admissibility of the Consent Order in different contexts. In the first case, Defendants were rebuffed in their attempt to argue that the Consent Order collaterally estopped further litigation on the issue of the legality of the Contracts. In the second case, Defendants were rejected in their attempt to plead an impossibility defense based on the Consent Order's nullification of the Contracts. In both cases, this Court held that the Consent Order was not created as the result of an adjudication of any kind, but rather by a negotiation which inevitably required the contributions and consent of Defendants. Thus, the Consent Order could not be considered a final judgment by a governmental agency that would preempt further litigation under the collateral estoppel doctrine, and was not issued by an " 'irresistible force ... that cannot reasonably be controlled.' " *See MG Refin. & Marketing, Inc. v. Knight Enterprises, Inc.,* 25 F.Supp.2d 175, 190 (S.D.N.Y.1998) (citing *Harriscom Svenska, A.B. v. Harris Corp.,* 3 F.3d 576, 577 (2d Cir.1993)). In the instant case, the Consent Order and the process that created it is not being offered to prove the illegality of the Contracts or the impossibility of performance, but rather to counter Plaintiffs' argument that the alleged breach of the Contracts by Defendants was caused by intentional deception rather than being the result of a negotiated compromise with a governmental agency that

independently initiated a thorough investigation into the legality of the Contracts.

The Court also disagrees with Plaintiffs' contention that the Consent Order is hearsay. The Consent Order, as Defendants note in their response to Plaintiffs' in limine motion, is being offered not for its truth but for its effect on Defendants' state of mind, so as to explain why MG took the actions and positions that it did in negotiating and entering into the Consent Order. Statements and records offered for their effect on the defendants' state of mind are not considered hearsay. *See Tierney v. Davidson,* 133 F.3d 189, 192 & n. 1 (2d Cir.1998) (statements by anonymous caller and two bystanders were not hearsay when they were offered for their effect on police officer's state of mind); *Inside Radio, Inc. v. Clear Channel Communs., Inc.,* 208 F.R.D. 537, 543 (S.D.N.Y. 2002) (statements of confidential sources not hearsay because offered "not for the truth of the sources' statements but for their effect on [defendant's] state of mind"); *see also Whiting v. Old Brookville Bd. of Police Comm'rs,* 4 Fed. Appx. 11 (2d Cir.2001) (unpublished summary order) (finding police records were not hearsay because they were admitted not for their truth but for their effect on state of mind of board of police commissioners and others in pursuing charges against officer). Because the Court finds the Consent Order to be non-hearsay, it need not consider whether the Consent Order fits under the business records exception.

Finally, the Court notes that the Consent Order is an important part of the background of this matter, and many different questions raised throughout the trial relate back to the Consent Order and the process that created it. Thus, to exclude the Consent Order and its history from discussion at trial would only serve to confuse the jury later when such questions arose. Therefore, the Court finds the Consent Order's inclusion in the trial to be necessary to prevent further jury confusion and to offer the clearest history of the matter to the jury.

C. *MOTION TO EXCLUDE REFERENCES TO RELIGIOUS AFFILIATION OF MGAG'S FOUNDERS*

Plaintiffs seek an order to bar any reference at trial to the religious affiliation of any of the original founders and original owners of MGAG (the "Founders"). Defendants claim that while they have no intention of making any such references, they wish to reserve the right to introduce evidence related to the Founders' religious affiliation in the event that Plaintiffs unduly emphasize the national origin of MGAG, a German company. Presumably, Defendants feel that any bias a jury might have against MGAG for being a German company will be counterbalanced by the knowledge that MGAG was founded by individuals of the Jewish faith.

While the Court agrees with Plaintiffs that any such reference would be irrelevant to trying this complicated oil and gas derivative contracts case, it is not persuaded that the Court needs to issue an order to prevent such references. If Defendants believe that Plaintiffs are emphasizing the national origin of MGAG in a manner that is potentially prejudicial, the correct solution would be for Defendants to object at that time, rather than to introduce counter-evidence that will only further complicate and confuse the matter. Thus, the Plaintiffs' motion is denied.

D. *MOTION TO EXCLUDE EVIDENCE AND ARGUMENT ON MITIGATION OF DAMAGES*

Plaintiffs seek an order to exclude evidence and argument regarding Defendants' affirmative defense of mitigation of

damages, asserting that such a defense is not applicable because the measure of damages in this matter is the value of the lost Contracts at the time of the alleged breach. The Court disagrees with Plaintiffs' assertion and consequently denies their motion to exclude.

Traditionally, New York courts have adhered to the "universally accepted common law principal [sic] that a harmed plaintiff must mitigate damages." *Van Syckle v. C.L. King & Assoc., Inc.,* 822 F.Supp. 98, 102 (N.D.N.Y.1993); *see also Drummond v. Morgan Stanley & Co., Inc.,* No. 95 Civ.2011 DC, 1996 WL 631723, at *2 (S.D.N.Y. Oct.31, 1996) ("It is well settled that a plaintiff who suffers injury as the result of a breach of contract is under a duty to mitigate damages"). This duty to mitigate arises from "the principle that 'damages which the plaintiff might have avoided with reasonable effort ... are ... not caused by the defendant's wrong ... and, therefore, are not to be charged against him.'" *M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103, 1112 (2d Cir.1985) (quoting 2 Williston on Contracts § 1353 at 274 (1962)).

In one case that Plaintiffs cite, the Second Circuit acknowledged an exception to this duty when a party is not seeking consequential damages.[3] *See Bank of New York v. Amoco Oil Co.,* 35 F.3d 643, 659 (2d Cir.1994). However, the Court is not satisfied that Plaintiffs have sufficiently demonstrated that their case does not involve consequential damages. Its skepticism may be justified by distinguishing the situation in *Bank of New York* from the one at bar.

In *Bank of New York,* the defendant issued to Drexel Burnham Lambert Trading ("DBL") certificates which certified that the defendant was holding specified quantities of platinum for release to DBL upon surrender of the certificate properly endorsed. DBL used these certificates as collateral to secure loans from the plaintiff, then two months later went bankrupt. With DBL in default, the plaintiff demanded that the defendant deliver to the plaintiff the platinum owed under the certificates, and the defendant refused. After initiating litigation against the defendant, plaintiff finally reached a partial settlement with the defendant and received the requested platinum, but in the time between the initial request and the eventual delivery, the value of the platinum had fallen. As a result, the plaintiff maintained the lawsuit to recover its losses. The defendant argued that the plaintiff should have mitigated its damages by selling platinum futures contracts, but this Court ruled that the plaintiff was only seeking damages equal to the value of the platinum on the date the plaintiff's request was refused, and not consequential damages. Thus, this Court "decline[d] to impose a duty to mitigate upon the holder of a duly negotiated document of title whose demand for the goods covered by the document was improperly refused." *Id.* at 660.

In the instant case, Plaintiffs cannot point to a moment where they requested delivery of the petroleum under the Con-

---

**3.** The New York Uniform Commercial Code defines consequential damages resulting from the seller's breach as:

 (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

 (b) injury to person or property proximately resulting from any breach of warranty. N.Y.U.C.C. Law § 2–715(2) (McKinney 2001).

■

tracts and were refused. Moreover, the motivation behind enforcement of the contracts in *Bank of New York* and the instant case are distinct. The *Bank of New York* plaintiff did not want platinum for its business use, but rather wanted the platinum that had been pledged to it as collateral for its loan to DBL. Thus, mitigation by selling platinum futures contracts would have imposed a separate burden on the plaintiff that did not directly resolve the issue of the outstanding platinum still owed to the plaintiff, and would have even created a new legal obligation for the plaintiff dependent in part on the performance of the defendant.

By contrast, Plaintiffs in the instant case allege that they entered into the Contracts with the intent of purchasing petroleum at some point for their business use. When the Contracts became invalid, Plaintiffs could have attempted to secure other long-term petroleum delivery contracts in order to continue fulfilling their petroleum needs, which would have resolved their concerns about petroleum deliveries without sacrificing their right to prosecute their claim for breach of contract. Moreover, such action would have mitigated the alleged damages they incurred when they were unable to take delivery of petroleum from the Contracts. Thus, the Court is not persuaded that the Plaintiffs have demonstrated that their case fits the narrow exception to the traditional duty to mitigate, and therefore rejects Plaintiffs' request to exclude all evidence and argument on such a defense.

4. Plaintiffs also initially contested Defendants' affirmative defenses of statute of limitations and laches, but Defendants state that they do not intend to press either defense at trial, and are preserving the statute of limitations issue that was ruled on previously by this Court for

■

E. *MOTION TO EXCLUDE EVIDENCE AND ARGUMENT ON WAIVER, AGREEMENT TO RESCIND AND EQUITABLE ESTOPPEL*

■ Plaintiffs move to exclude evidence and argument on Defendants' affirmative defenses of waiver, agreement to rescind and equitable estoppel.[4] Defendants assert that these defenses are relevant because of oral agreements to rescind the Contracts made with nine of the eleven plaintiffs. The Court is persuaded that these three defenses were rejected by this Court in a previous ruling on summary judgment, and consequently grants the Plaintiffs' motion.

Paragraph 19(f) of the Contract reads:

No amendment or waiver of any provision of [the Contract], nor consent to any departure by either party therefrom, shall be effective unless the same is in writing and signed by the party to be charged with such amendment, waiver or consent.

(See Contract, attached as Exhibit 4 to Memorandum in Support of Plaintiffs' Motion in Limine to Exclude Evidence and Argument on the Statute of Limitations, Waiver, Agreement to Rescind, Equitable Estoppel and Laches, dated March 24, 2003 ("Pl. Motion in Limine Memo."), at 8.)

In a Memorandum Opinion issued on March 30, 2000 by Judge Kaplan before the case was reassigned to this Court, Judge Kaplan denied Defendants' motion for summary judgment based in part on his ruling that the Contracts cannot be modified by a sworn statement referencing a prior unwritten agreement to cancel be-

appeal. (See MG Defendants' Opposition to Plaintiffs' Motion in Limine to Exclude Evidence and Argument on the Statute of Limitations, Waiver, Agreement to Rescind, Equitable Estoppel and Laches, dated April 10, 2003, at 1.)

cause Paragraph 19(f) forbids unwritten modifications. *See Cary Oil Co., Inc. v. MG Refin. & Marketing, Inc.,* 90 F.Supp.2d 401, 417 (S.D.N.Y.2000) ("Cary Oil I"). Moreover, Judge Kaplan held that Paragraph 19(f) prohibited oral rescission as well, even if the Contracts explicitly prohibited only amendment, waiver or departure by any party. *Id.* (holding that "[r]ecission [sic] necessarily is included in amendment, waiver or departure" and "[t]herefore, the [Contracts] prohibit not only modification, but also rescission.").

The Court considers these rulings to be the law of the case, and is unpersuaded by Defendants' arguments that such holdings are dicta, unsupported by authorities, a misreading of the plain language of Paragraph 19(f) or clearly contrary to the law of New York. First, Judge Kaplan made these rulings while explaining his reasons for denying Defendants' motion for summary judgment, which renders such language necessary to the holding and therefore not dicta. *See United States v. Henderson,* 961 F.2d 880, 882 (9th Cir. 1992) (defining dicta as language that is "unnecessary to [the court's] holding"); *United States v. Awadallah,* 202 F.Supp.2d 55, 72 (S.D.N.Y.2002) (asserting that prior Ninth Circuit opinion's discussion on issue "was unnecessary to the court's holding and therefore dicta.").

Moreover, Judge Kaplan's discussion needed no citation to legal authority because it was a common sense reading of the plain language of the clause in question. Finally, New York law clearly supports Judge Kaplan's ruling. *See Chemical Bank v. Wasserman,* 37 N.Y.2d 249, 371 N.Y.S.2d 919, 333 N.E.2d 187, 188 (1975) (stating that "an oral understanding [cannot] effectively terminate an agreement requiring termination to be in writing" and holding that "section 15—301 of the General Obligations Law ... precludes

both oral modifications and oral terminations."). Thus, Defendant's affirmative defense of agreement to rescind is barred from introduction at trial.

▮ Based on this conclusion, Defendants' attempted defense of equitable estoppel also fails. The doctrine of equitable estoppel can be raised "where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's *justifiable* reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.,* 274 F.3d 706, 725 (2d Cir.2001) (emphasis added). Here, the Court is not persuaded that Defendants can claim they justifiably relied on oral agreements to terminate a contract with a clause—drafted by Defendants under negotiations with a sophisticated business party and printed on Defendants' letterhead—that explicitly stated such oral agreements were invalid. Even without such a clause, a sophisticated business entity such as Defendants should have known that an issue as significant as the rescission of the Contracts would need to be made in writing. Thus, the Court rejects Defendants' defense of equitable estoppel.

▮ Finally, Defendants' defense of waiver is equally unpersuasive because it directly contradicts the plain language of Paragraph 19(f), which expressly forbids waiver of any part of the Contract unless such a waiver is in writing signed by the party to be charged. As discussed above, New York courts have held that oral agreements cannot terminate contracts that require such terminations to be in writing. *See Chemical Bank,* 371 N.Y.S.2d 919, 333 N.E.2d at 188 (noting negation of *Green v. Doniger,* 300 N.Y. 238, 90 N.E.2d 56 (1949), because of enactment of Section 15–301 of the General Obligations Law). Thus, without a written waiver signed by Plaintiffs, Defendants

cannot establish a defense of waiver as a matter of law.

### F. MOTION TO EXCLUDE EVIDENCE, ARGUMENT AND EXPERT OPINION ON WHETHER PLAINTIFFS WOULD HAVE BEHAVED OPTIMALLY HAD THE CONTRACTS NOT BEEN BREACHED

Plaintiffs move to exclude evidence, opinion and argument on whether Plaintiffs would have exercised their rights under the Contracts at the most profitable point in time had the Contracts not been breached. Plaintiffs argue that Defendants' intended submissions at trial as to whether Plaintiffs might have behaved "sub-optimally" are not relevant to the fair market value calculation Plaintiffs assert should be used to assess damages, and would be unduly confusing and prejudicial. The Court disagrees.

As noted in the Court's ruling on the Motion to Exclude Evidence and Argument on Mitigation of Damages, dated April 23, 2003, the Court is skeptical that the Plaintiffs' damages can be calculated simply by measuring the fair market value of the Contracts at the time of breach because Plaintiffs' damages may be consequential in nature and could require consideration of Plaintiffs' behavior in mitigating the damages. The Court applies this line of reasoning to calculating the Contracts' value as well, observing that such value is not ascertainable by a simple objective valuation of the Contracts at the time of breach, such as the one contained in Paragraph 14 of the Contract. Instead, the possibility that Plaintiffs may have acted in a manner that was "sub-optimal" based on business reasons or imperfect information must also be considered, and thus Defendants must be allowed to introduce evidence, opinion and argument to such effect.

Plaintiffs argue that the Contracts can be valued in the same way as stock option contracts based on a defined date of breach. However, the Plaintiffs' own expert, Professor Alexander Triantis ("Triantis"), values damages under the Contracts by utilizing a "binomial tree" model, which resembles in part the Black–Scholes or binomial models commonly used to value stock options, but is significantly more complicated because of its reliance on several additional variables. See International Symposium on Risk Management and Derivatives, *Panel 1: Accounting,* 8 Fordham J. Corp. & Fin. L. 5, 26, 29–30 (2003) (describing binomial tree model as an "academic approach" that is "impractical" and a "very complex contingent claims model," and thus distinct from the commonly utilized Black–Scholes model). For example, Defendants' expert, Professor Stephen Ross, who created the binomial tree model upon which Triantis relies, notes that one must account for "the actual behavior of heating oil and gasoline futures prices" in valuing the Contracts because they are "derivative instrument[s] involving a commodity, rather than a financial asset such as a stock." (See Expert Report on Damages, dated June 14, 2001, attached as Exhibit C to Memorandum in Support of Plaintiffs' Motion in Limine to Exclude Evidence, Argument and Expert Opinion on Whether Plaintiffs Would Have Behaved Optimally Had the Contracts Not Been Breached, dated March 12, 2003, at 4.) Thus, it is not reasonable to compare the calculation of damages for a stock option holder to the calculation of damages for a party to one of the Contracts.

Plaintiffs next contend that if Defendants can introduce evidence about suboptimal behavior, Plaintiffs should be allowed to offer valuation evidence based on

Plaintiffs' exercise of their cash-out rights in June 2000. The Court agrees. While it is undisputed that Plaintiffs were already engaged in the instant litigation over breach of the Contracts for more than a year when they exercised this right, the Court is persuaded that such information should be presented to the jury, which can consider the information's relevance if the jury determines that the Contracts were not effectively terminated when Defendants entered into the CFTC consent decree on July 27, 1995. However, if the Contracts are found to have been terminated prior to June 2000, then the valuation of the Contracts at such a date will be irrelevant.

## II. DEFENDANTS' MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY OF ALEXANDER TRIANTIS

■ Defendants move to exclude the proposed expert testimony of Triantis on the grounds that Triantis' opinions do not fit the facts of the case. The Court finds that Triantis's expert testimony satisfies the standards for such testimony as enunciated by the Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and thus should be admitted. Therefore, the Court denies Defendants' motion.

■ A trial court must decide if a qualified expert's testimony rests on a reliable foundation, or is simply based on "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Inherent in this analysis is the question of whether the testimony is relevant in that it "fits" the facts of the case. *Id.* at 591–92, 113 S.Ct. 2786. Moreover, such testimony must "assist the trier of fact to understand the evidence or determine a fact in issue." *Id.* at 591, 113 S.Ct. 2786 (quoting Fed.R.Evid. 702).

Defendants argue that Triantis's testimony does not fit the facts of the case because it only values the Contracts blowout option, and does not account for the value of the Contracts as if they were oil delivery contracts. The Court is mindful of this argument because Triantis's reports—both before and after the Court's decision on summary judgment was issued in this case—focus more significantly on the blowout option. Indeed, Triantis's two reports issued before the summary judgment decision both state that his contract valuations "ignore the delivery option inherent in the contract" and "do not incorporate a potentially valuable delivery option. . . ." (Opinion on Damages, dated April 11, 2001, and Opinion on Damages, dated April 13, 2001, attached as Exhibits A & B to MG Defendants' Motion in Limine to Exclude the Proposed Expert Testimony of Alexander Triantis, dated March 28, 2003 ("Def. Motion"), at 6, 28.) Triantis's report after the summary judgment decision attempts to include references to the delivery option, but this change in discussion only highlights the lack of work Triantis has done in valuing the Contracts based on the delivery option. (See Opinion on Damages, dated November 19, 2002 [misdated as 2001], attached as Exhibits C to Def. Motion, at 6, 30.)

However, the Court disagrees with Defendants' interpretation of the Court's summary judgment decision regarding Plaintiffs' burden in proving the legality of the Contracts, which Defendants offer in order to explain why Triantis's testimony should be excluded. The Court there ruled—consistent with Magistrate Judge Eaton's Report and Recommendation on the matter and Judge Sotomayor's ruling in a separate but related case—that the Contracts were "unenforceable as a matter

of law" if found to be "entered into ... for purely speculative purposes...." *Cary Oil Co., Inc. v. MG Refin. & Marketing, Inc.*, 230 F.Supp.2d 439, 446 (S.D.N.Y. 2002). However, this conclusion does not mean that the inverse is true and that the Contracts are enforceable only if found to be entered into solely for delivery. Instead, the Court concurred with Judge Sotomayor's conclusion that a Contract could be enforceable if "negotiated as part of larger transactions" which considered the Contracts as hedging instruments "for insuring against certain price fluctuations that might arise as petroleum was delivered under the terms of the ratable or other contracts."[5] *Id.* at 447 (quoting *MG Refin. & Marketing, Inc. v. Knight Enterprises, Inc.*, 25 F.Supp.2d 175, 187–88 (S.D.N.Y.1998)). The Court subsequently applied such reasoning to deny summary judgment against plaintiff Satterfield Oil Co. ("Satterfield") because it was "unclear from the record" what kind of risk-management program MGRM was offering and whether Satterfield's involvement in the program "was somehow linked to legitimate hedging or managing inventory costs." *Id.* at 451. Thus, the Court found that Plaintiffs could, under certain circumstances, enter into the Contracts and have them enforced even if Plaintiffs contemplated using the Contracts at least in part to hedge their risk and did not intend only to take delivery.

As a result, while Triantis's testimony may be incomplete because of its focus on the blowout option, it is not inadmissible for lacking relevancy or not fitting the facts of the case. The possibility of Plaintiffs blowing out their entire Contract volume existed, and even if that possibility was part of Plaintiffs' thought process in entering into the Contracts, the Court is not satisfied that such a consideration by itself would render the Contracts unenforceable. Accordingly, the Defendants' motion is denied.

---

**5.** The Contracts were issued by Defendants as part of a risk management program, which included the Contracts and a type of contract called a "ratable" contract, both of which were fixed-price supply contracts. The ratable contract provided for monthly delivery of a specified volume, apportioned "ratably" over the contract's five-year or ten-year term. The Contracts differed from ratable contracts in that, unlike the ratable's monthly delivery schedule, the Contracts allowed customers to schedule delivery flexibly within the contract term. Both the ratable contracts and the Contracts contained a cash "blow-out" option. *See Cary Oil*, 230 F.Supp.2d at 443–44.